IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


RICK HOMANS,

      Plaintiff,

vs.                                      No. CIV 01-917 MV/RLP

THE CITY OF ALBUQUERQUE, a Municipal
Corporation and MARGIE BACA ARCHULETA
in her capacity as Clerk of the City of Albuquerque,

      Defendants.


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction **[Doc. No. 3].**   The Court held a hearing on this matter on August 30, 2001, where the parties presented testimony and legal argument.   For the reasons that follow, the Plaintiff's Motion for Preliminary Injunction is **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

Rick Homans is a duly qualified candidate for mayor in the City of Albuquerque, New Mexico, whose name will appear on the printed ballot for the mayoral election scheduled to be held on October 2, 2001.  Mr. Homans brings this action seeking a declaratory judgment that Article XIII, Section 4(d)(2) of the Albuquerque City Charter violates the First Amendment to the United States Constitution.  That section states:

(d)      No candidate shall allow contributions or make expenditures in excess of

           the following for any election:

*     *     *

1

(2)     To a candidate for the office of Mayor contributions or expenditures equal to

twice the amount of the annual salary paid by the City of Albuquerque to the

mayor as of the date of filing of the Declaration of Candidacy.

The salary of the current mayor is $87,360.00.  Therefore, the expenditure limitation for the

October 2, 2001 mayoral election is $174,720.00.  Under the terms of the City Charter, Article

XIII, Section 4(d)(2), Mr. Homans is subject to a $500 fine for each violation of the expenditure

limitations.  In addition, if Mr. Homans wins the election, he is subject to potential public

reprimand and removal from office by the Albuquerque City Council.

Prior to Mr. Homans' registration of  his candidacy for mayor, a state court issued a

preliminary injunction which prevented enforcement of the expenditure limitations at issue in this

case.  When Mr. Homans received informational materials from the city regarding his candidacy,

he was informed verbally by a city employee that the expenditure limits would not be enforced.

The state court action was brought by three voters.  A candidate intervened in the action and

argued that the voters lacked standing to bring suit.  The state court agreed and gave the

candidates twenty days to join the lawsuit before it would be dismissed for lack of standing.

Neither Mr. Homans nor any other candidate joined, and the case was dismissed on August 15,

2001.

Mr. Homans sought a preliminary injunction and a temporary restraining order before this

court, seeking an order enjoining enforcement of the expenditure limitation provision of the City

Charter.  In support of his motions, Mr. Homans claims that the Charter is an unconstitutional

infringement on his First Amendment freedom of speech.  He contends that, in reliance on a city

employee's assertion that the limits would not be enforced in this election, he has already

2

exceeded the Charter's expenditure limits.  He further claims that if the expenditure limits are not

enjoined, he will have to stop campaigning and close his campaign headquarters.  The City

maintains that the Charter is a constitutional limitation on campaign spending and that

enforcement of the limitation will not cause Mr. Homans irreparable injury.

The Court held a hearing on August 20, 2001, for the purpose of determining whether Mr.

Homans was entitled to temporary injunctive relief.  Based on the limited record before the Court

at that time, the Court found that Mr. Homans had shown a likelihood of success on the merits of

his claim that the City Charter violated the First Amendment, that he would suffer irreparable

harm if enforcement of the Charter were not enjoined, that the balance of harms weighed in his

favor, and that the public interest weighed in his favor.  Thus, the Court granted Mr. Homans'

motion for temporary injunctive relief.  The Court held another hearing on August 30, 2001, for

the purpose of determining whether Mr. Homans was entitled to preliminary injunctive relief.  By

this time, the Court had had an opportunity to review the evidence submitted by the City in

opposition to Mr. Homans' motion.  At the hearing, the Court heard the testimony of Mr. Larry

Makinson, an expert on election reform from the Center for Responsive Politics.  The Court also

heard argument from counsel for both parties on the issue of whether Mr. Homans is entitled to

preliminary injunctive relief.

Based on the evidence submitted thus far, the Court makes the following factual findings:

1.      Albuquerque's expenditure limits were enacted in 1974.  Def. Ex. 1 at 4.

2.      Albuquerque is one of the few remaining cities that limits the amount of money a

candidate for political office may spend on his or her own campaign.  *See* John C. Bonifaz, et al.,

*Challenging Buckley v. Valeo: A Legal Strategy*, 33 Akron L. Rev. 39, 56 (1999).

3.      A system of unlimited spending has deleterious effects on the competitiveness of elections because it gives incumbent candidates an electoral advantage.  *See* Tr. at 37-44.

4.      Nationwide, eighty-eight percent (88%) of incumbent mayors successfully sought reelection in 1999.  *See* Def. Ex. 1 at 6.  In contrast, since 1974, Albuquerque has had a zero percent (0%) success rate for mayors seeking reelection.  *See id.*

5.      Many successful candidates for the office of Mayor of the City of Albuquerque have spent far less than the maximum expenditure allowed.  *See* Def. Exs. 10 & 11.

6.      The current mayor of Albuquerque, Jim Baca, ran a successful campaign for mayor in 1997, winning the election after spending only $43,888.26 on television advertising.  *See* Def. Ex 9, ¶ 3.  During that campaign, Mayor Baca relied primarily on grassroots outreach rather than on television advertising.  *See id.* at ¶¶ 2-3.

7.      Between 1991 and 1995, in Cincinnati, where there are no expenditure limits, forty-five percent (45%) of all funds raised for elections came from donors contributing a minimum of $1,000.00.  Between 1989 and 1997, in Albuquerque, which imposed expenditure limits, only twenty-seven percent (27%) of all funds raised came from donors contributing a minimum of $1,000.00.  *See* Tr. at 45; Def. Ex. 20.

8.      In Cincinnati's 1995 elections, fifty-three percent (53%) of all funds raised for elections came from donors contributing at least $1,000.00, whereas only six percent (6%) of the funds raised came from donors contributing less than $100.00.  In Albuquerque's 1995 elections, by contrast, twenty-seven percent (27%) of all funds raised came from donors contributing a minimum of $1,000.00 and thirteen percent (13%) of all funds raised came from donors contributing less than $100.00.  *See* Tr. at 46; Def. Ex. 21.

9.      In the last federal Congressional election, in more than half the Congressional districts in the country, the winning candidate outspent the losing candidate by a factor of ten to one or more. *See* Tr. at 20-21.

10.      As the cost of elections rise, candidates for office at every level of federal, state, and city government are under a great deal of pressure to engage in fundraising activities and to depend on the goodwill of their donors. *See id.* at 22-23.

11.      Voter turnout for all Albuquerque elections between 1974 and 1999 was approximately forty percent (40%). *See* Def. Ex. 1 at 7.  Voter turnout for cities without expenditure limits is generally between twenty-five percent (25%) to thirty-five percent (35%). *Id.*  Voter turnout in Albuquerque is generally higher than most major cities. *See id.* at 7-8.

12.      During 1997, spending limits in Albuquerque were enjoined.  Studies of the temporary removal of the limits show a correlation to a significant decrease in voter turnout. *See Ex. 1* at 8.

13.      Campaigns where there are no spending limits in place tend to reduce the number of lower-income to lower-middle-income citizens who can run for office with some expectation of winning. *See id.* at 10.

14.      A spending gap between incumbents and challengers generally results in diminished competitiveness in elections. *See id.* at 11.

15.      Candidates in elections where spending limits are imposed tend to spend more campaign money on actual voter contact. *See id.* at 14.

16.      A survey of Albuquerque voters shows that most voters consider newspaper coverage, public debates and forums, seeing the candidate in person, and radio and television

news coverage more important than radio and television advertisements. *See* Def. Ex. 2 at 2.

17.     Fifty-seven percent (57%) of surveyed Albuquerque voters think that federal elections are overly influenced by special interest money.    In contrast, only twenty-three percent (23%) think that Albuquerque elections are overly influenced by special interest money.  *See* Def. Ex. 2 at 3.  Forty-nine percent (49%) think that only candidates with access to large sums of money are able to run for federal office and win. *See id.*  Only five percent (5%) think that ordinary citizens are able to run for federal office and win. *See id.*

18.     Fifty-seven percent (57%) of surveyed Albuquerque voters strongly favor the current spending limits. *See id.* at 6.  Another twenty-five percent (25%) not-so-strongly favor the current spending limits. *See id.*  Seventy-one percent (71%) believe that spending limits improve the fairness of elections by ensuring that ordinary citizens, not just the very wealthy, can run for office in Albuquerque without having to raise so much money from special interest groups. *See id.*

19.     Unlimited spending on mayoral races has a detrimental impact on the local electoral process.  *See* Def. Ex. 9 at ¶¶ 4-6.

20.      In the last twenty-five years, the cost of running for a seat in the United States House of Representatives[1] has risen by approximately 400 percent. *See* Tr. at 17.  This rise does not reflect simply a rise in the cost of living. *See id.* at 18.

21.     Federal contribution limits have not effectively changed the negative public perception of the undue influence of large donors on federal elected officials. *See id.* at 22, 34.

22.     It is not difficult for large donors to get around federal and state contribution limits

--------

[1]     There are no limits on campaign spending by candidates for federal offices.

through practices such as "bundling." *See id.* at 26-27.

## STANDARD OF REVIEW

The district court may grant a preliminary injunction if the moving party shows: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-43 (10th Cir. 1994) (*citing Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.), cert. denied, 510 U.S. 916, 114, 1543 S.Ct. 307, 126 L.Ed.2d 254 (1993); *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992)). "Because a preliminary injunction is an 'extraordinary remedy . . . the right to relief must be clear and unequivocal.'" *Kansas Health Care*, 31 F.3d at 1543 (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

## DISCUSSION

A.    Likelihood of Success on the Merits

1.     The Scope of the Holding of *Buckley v. Valeo*

Plaintiff challenges the limit on campaign expenditures as unconstitutional under the First Amendment.  In 1976, the case of *Buckley v. Valeo* presented the Supreme Court with challenges to two provisions of the Federal Election Campaign Act: the first limited the contributions individuals could make to a campaign, and the second limited the amount of money a candidate

could spend on his or her own campaign.  424 U.S. 1 (1976).   The Court held that contribution

limits were constitutional due to a compelling governmental interest in eliminating either

corruption or its appearance in the electoral process, and that such restrictions did not preclude

individuals or groups from expressing their support of a particular candidate. *Id.* at 26-29.  The

Court recently affirmed the position that there is a compelling governmental interest in eliminating

corruption or its appearance in *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000)**.**

 However, when the Supreme Court decided *Buckley* in 1976, it found that restrictions on

individual expenditures were not justified by the government's interest in battling corruption

because independent spending in candidate elections was thought to present little risk of quid pro

quo bargaining.  *See id.* at 45- 47.

        Since the announcement of *Buckley* twenty-five years ago, the Supreme Court has been

divided as to *Buckley's* scope.  Particularly, there is substantial disagreement amongst the Justices

as to whether the ruling in *Buckley* provides a per se ban on all expenditure caps.  The Sixth

Circuit opinion, *Kruse v. City of Cincinnati,* 142 F.3d 907 (6th Cir. 1998), is the sole circuit court

opinion that addresses this issue directly.    In *Kruse,* a divided panel interpreted *Buckley* to render

spending limits unconstitutional as a matter of law.  One member of the panel, while concurring

with the outcome of the case on the facts, disagreed with the majority's interpretation of *Buckley*:

"The Supreme Court's decision in *Buckley* [...] is not a broad pronouncement declaring all

campaign expenditure limits unconstitutional.  It may be [...] that the interest in freeing

officeholders from the pressures of fundraising so that they can perform their duties, or the

interest in preserving faith in our democracy, is compelling, and that campaign expenditure limits

are a narrowly tailored means of serving such an interest."  *Id.* at 920 (concurring opinion of

Cohn, D.J., sitting by designation).

Several Justices of the Supreme Court have been equally reluctant to read *Buckley* as holding all expenditure limitations as per se violations.   In *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), four Justices argued that *Buckley* should not be interpreted as precluding the enactment of expenditure limits.  Justice Breyer argued that "it might prove possible to reinterpret aspects of *Buckley* in light of the post-Buckley experience... making less absolute the contribution/expenditure line [...]," and suggested an analysis of campaign finance limits that balances competing constitutional interests.   *Id.* at 913 (concurring opinion of Breyer, J., joined by Ginsburg, J.).   Justice Kennedy stated, "[f]or now, however, I would leave open the possibility that Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions, thus permitting officeholders to concentrate their time and efforts on official duties rather than fundraising." *Id.* at 916 (Kennedy, J., dissenting).

In *Colorado Republican Federal Campaign Committee v. Federal Election Commission*, 518 U.S. 604 (1996), the Supreme Court was again divided in its interpretation of *Buckley's* scope.  Justice Thomas argued in concurrence with the judgment for the wholesale reinterpretation of Buckley to render both contribution and expenditure limitations per se unconstitutional.  However, Justice Stevens, joined by Ginsburg, argued that "[i]t is quite wrong to assume that the net effect of limits on contributions or expenditures -- which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fund-raising, and to diminish the importance of repetitive 30-second commercials -- will be adverse to the interest in informed debate protected by the First Amendment." *Id.* at 649.  The plurality was unable to persuade the other Justices to adopt a unified vision of the scope of

*Buckley*.

In a recent case in the District of Vermont challenging the constitutionality of Vermont's comprehensive Campaign Finance Reform Act, District Judge Sessions wrote "the constitutionality of expenditure limits bears review and reconsideration.  Spending limits are an effective response to certain compelling governmental interests not addressed in *Buckley*: (1) "Freeing office holders so they can perform their duties," in the words of Judge Cohn, *Kruse*, 142 F.3d at 920, or, as Justice Kennedy put it, "permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising," *Shrink*, 120 S.Ct. at 916;  (2) "[P]reserving faith in our democracy," *Kruse*, 142 F.3d at 920;  (3) "[P]rotecting access to the political arena" as stated by [Justice] Stevens, *Colorado Republican*, 518 U.S. at 649-650, 116 S.Ct. 2309;  and (4) "diminish[ing] the importance of repetitive 30-second commercials." *Id*."  *Landell v. Sorrell*, 118 F.Supp.2d 459, 482-3 (D.Vt. 2000).

The abundance of judicial commentary on compelling governmental interests which fall outside the ambit of *Buckley* convinces this Court to read *Buckley's* holding narrowly. Furthermore, the judicial uncertainty regarding the scope of *Buckley*'s holding in light of the post-*Buckley* experience suggests that the Court must consider Albuquerque's twenty-five years of campaign finance history in evaluating the constitutionality of the City Charter.  In doing so, this Court is persuaded that the holding of *Buckley v. Valeo* does not render Albuquerque's expenditure limits per se unconstitutional.

2.      Albuquerque's Expenditure Limits in Mayoral Elections Are Narrowly Tailored to Meet

Compelling Governmental Interests

As stated above, there are a variety of compelling governmental interests not addressed in

*Buckley* which may withstand strict scrutiny.  The City of Albuquerque has demonstrated

evidence of two such interests, which are related: preserving the public faith in democracy, and

reducing the appearance of corruption. *Buckley* and its progeny have made it clear that there is a

compelling state interest in preventing corruption or the appearance thereof.   However, *Buckley*

found that while contribution limitations were a necessary measure to meet this goal, the rationale

did not apply to expenditure limits.

While it may have been sufficient in the era of *Buckley* to curb corruption and its

appearance with contribution limits, it is clear today that the public perception of Albuquerque

citizens is that unlimited spending infects the political process, so much so that the populace

declines to vote when large amounts of money are spent on campaigns.  The record in this case

establishes that the expenditure limits in Albuquerque have effectively reduced at least the

appearance of corruption, as evinced by the correlation between voter turnout and the use of

expenditure limits.  When the limits are enforced, voter turnout is far higher than the national

average.  When they are not enforced, voting declines to below the high end of the national

average, a mere 33% of registered voter participation.   The record also shows that in the City of

Albuquerque, there is a distinct inverse correlation between voter turnout and how much is spent

by candidates on campaigning.  This fact alone shows that the City of Albuquerque has an interest

in "diminish[ing] the importance of repetitive 30-second commercials," as a method of preserving

the public faith in, and thus the strength of, democracy. *Colorado Republican*, 518 U.S. at

11

649-650 (Stevens, dissenting).   Simply put, the more candidates spend, the more disillusioned

Albuquerque voters become in the electoral process, and they express their cynicism by failing to

vote.  This is dangerous to the health of American democracy.

There are additional compelling governmental interests in curbing the escalating cost of

elections.  The record shows that Albuquerque voters are concerned with the appearance of

corruption.  Particularly, they are concerned that "special interest" money affects political

decisions at the federal level.  While there is no concrete evidence of such quid pro quo

corruption, the appearance of it influences Albuquerque voters.  The Supreme Court has found

that direct proof of quid pro quo arrangements in campaigns need not be present to trigger a

compelling governmental interest in campaign finance reform.  The majority in *Shrink* explicitly

addressed the dangers of  "improper influence" and "opportunities for abuse," and expressed

> [...]concern not confined to bribery of public officials, but extending to the
> broader threat from politicians too compliant with the wishes of large
> contributors.  These were the obvious points behind our recognition that the
> Congress could constitutionally address the power of money 'to influence
> governmental action' in ways less 'blatant and specific' than bribery. *Buckley
> v. Valeo*, 424 U.S., at 28, 96 S.Ct. 612.

528 U.S. 377 at 389.

Rising campaign costs produce what has become known as a fundraising "arms race."  In

the arena of unlimited spending, the overwhelming trend is that those who outspend their

competitors win elections.  Incumbents and other candidates are therefore forced to spend

innumerable hours eliciting contributions rather than performing public duties or ascertaining the

interests of those citizens unable to make large financial contributions to their campaigns.  Such

"arms races" are clearly in effect in our federal elections, and the impression of Albuquerque

residents is that federal elections are subsequently influenced by "special interest" money and that

federal offices are inaccessible to the average person.   The record is clear that the vast majority of residents of Albuquerque, indeed seventy-one percent, feel that spending limits improve the fairness of elections by ensuring that ordinary citizens, not just the very wealthy, can run for office in Albuquerque without having to receive large sums of money from special interest groups.  This demonstrates that the expenditure limitations created by the City of Albuquerque have indeed preserved public faith in democracy by preventing cynicism toward politicians who appear "too compliant with the wishes of large contributors." 528 U.S. 377 at 289.

At the federal level, evidence implies that contribution limits have been ineffective in curbing the appearance or the actuality of the improper influence of special interest groups, as practices such as "bundling" allow large donors to circumvent the limitations.  Regardless of whether this is true, Albuquerque residents make clear through their voting patterns that expenditure limits are required to preserve their faith in democracy to the degree that draws them into the voting booth.

Albuquerque may very well be the last municipality in the United States where expenditure limits remain in place.   It is also clear that Albuquerque remains unique amongst municipalities in its high voter participation, and in the vibrancy of its highly competitive mayoral elections.  The record clearly establishes twenty-five years of expenditure limits that have preserved the integrity of Albuquerque's electoral process and the public's faith in its elections.  As *Buckley* does not present an absolute bar to expenditure limits, this Court finds that the City Charter's expenditure limits are narrowly tailored to meet a compelling governmental interest, and do not run afoul the First Amendment.  Accordingly, Plaintiff has not shown a likelihood of success on the merits.

B.      Irreparable Harm

A plaintiff suffers irreparable injury when the court would be unable to grant an effective

monetary remedy after a full trial because such damages would be inadequate or difficult to

ascertain.  *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing *Tri-State Generation*

*& Transmission Assoc., Inc., v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir.

1989))  "When an alleged constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary."  *Id.* (citing 11A Charles Alan Wright, Arthur R. Miller

& Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.1995)); *see also Suster v.*

*Marshall*, 149 F.3d 523, 533 (1998) ("[t]he loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.").  Mr. Homans alleges that his First

Amendment right of free speech will be infringed if the Charter is not enjoined.  Therefore,

Mr. Homans has made a sufficient showing of irreparable harm.

C.      Balance of Harms

As addressed above, the Court concludes that Mr. Homans has not shown a likelihood of

success on his claim that the City's Charter violates the First Amendment, as the Charter is

narrowly tailored to serve a compelling government interest.  Nonetheless, Mr. Homans has

alleged an infringement of his First Amendment right to freedom of speech, and such allegation

alone is sufficient to demonstrate irreparable harm.  *See Kikumura*, 242 F.3d at 963; *Suster*, 149

F.3d at 533.  This Court cannot find that the City's interest in enforcing its campaign expenditure

limits is more compelling than Mr. Homans' interest in defending his Constitutional rights, or that

the harm to the City of enjoining the limits is more compelling than the harm to Mr. Homans of

14

enforcing the limits.  Therefore, the Court finds that the balance of harms weighs in favor of Mr. Homans.

### D.      Public Interest

As the record amply demonstrates, it is the clear public opinion of the citizens of Albuquerque that the state of our electoral system is in grave disrepair, and that expenditure limitations have been both successful and necessary in alleviating the perceived and actual harms of corruption that infect our modern democracy.  This public perception has been reiterated by the record -- by evidence of practices such as bundling to circumvent contribution limits and allow corruption, or its appearance, in our political market.  In light of these facts, and because voter turnout is directly linked to the limitation of expenditures in Albuquerque elections, it is clear that the public interest favors the defendants in this case.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** the motion for a preliminary

injunction is **DENIED**.

Dated this 1st day of September, 2001.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT COURT


Attorney for Plaintiff
Rick Alvidrez

Attorneys for Defendant
Dan Ramczyk
Randy Autio
Brenda Wright
John C. Bonifaz