UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

FILED
PCT COURT
MEXICO

02 MAR -4 PM 3: 51

RICK HOMANS,
Plaintiff,

v.                                                    No. CIV-01-917 MV/RLP

THE CITY OF ALBUQUERQUE,
a municipal corporation  and
FRANCIE D. CORDOVA,
in her capacity as Clerk of the City
of Albuquerque,
Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants, the City of Albuquerque, a municipal corporation, and Francie D. Cordova,

in her capacity as Clerk of the City of Albuquerque, by and through their attorneys, hereby

submit their Proposed Findings of Fact and Conclusions of Law based on the record before this

Court.

### Background and Summary of Proceedings

1.    The City of Albuquerque adopted limits on contributions to and spending by

candidates for city office through an amendment to the city charter in 1974, which the voters of

Albuquerque approved by a vote of over 90%. Def. Ex. 5, p. 5-45, "Election Code, Code of

Ethics Win Approval," Albuquerque Journal, February 27, 1974, A1.

2.  Since their inception in 1974, the limits have been set at some multiple of the salary of

the office to which the limit applies.  Pursuant to a 1999 amendment to the City Election Code,

the spending limit applicable to mayoral elections currently is set at an amount equal to twice the

annual salary of the office.  Article XIII, § 4(d)(2), Albuquerque City Charter.  Prior to that,

candidates were limited to spending an amount equal to the salary of the office. *See* Joint Stipulation of Certain Evidence for Expedited Determination on the Merits ("Stipulation"), ¶ 16.

3. Prior to 1997, Albuquerque held run-off elections for municipal elections when no one candidate received more than 40% of the vote. Stipulation, ¶ 22, 23. During the period when Albuquerque had run-off elections for mayor, mayoral candidates were also permitted to spend an amount equal to the salary of the office in the run-off election (if any). Run-off elections were eliminated in 1997 when they were invalidated as conflicting with the New Mexico Constitution. Stipulation, ¶ 23.

4. Elections for city office in Albuquerque are nonpartisan and are held in odd-numbered years. Stipulation, ¶ 17.

5. The spending cap applicable to the October 2, 2001 elections was $174,720 for the office of mayor. Stipulation, ¶ 9.

6. Albuquerque's spending limit for mayoral races was temporarily enjoined for the 1997 elections by a court order in *Murphy v. City of Albuquerque*, No. CV-97-0007826 (2d Judicial District). The spending limit was restored for the 1999 city council elections after the plaintiffs in *Murphy* withdrew their lawsuit through a stipulated dismissal. Stipulation, ¶¶ 14-15.

7. The mayoral spending limit was again enjoined in a letter order issued May 20, 2001 in the case of *Duran v. Archuleta*, No. CV 2001-01420 (2d Judicial District). The *Duran* lawsuit, however, was dismissed after the state court ruled on July 20, 2001 that the *Duran* plaintiffs lacked standing, thus reinstating the limits.

8. Plaintiff Rick Homans, a candidate for mayor, filed this action on August 10, 2001, along with a motion for preliminary injunctive relief against enforcement of the spending limits. This Court, after holding an evidentiary hearing, denied Homans' motion in a decision and order

dated September 1, 2001. *Homans v. City of Albuquerque*, 160 F. Supp. 2d 1266 (D. N.M. 2001). A two-judge panel of the 10th Circuit granted Homans' request for an injunction pending appeal on September 6, 2001. 246 F.3d 1240 (10th Cir. 2001). The Court of Appeals thereafter issued an order abating Homans' interlocutory appeal of the denial of his motion for preliminary injunction, so as to permit final adjudication of the merits in this Court and entry of final judgment. Order dated November 2, 2001 in *Homans v. City of Albuquerque*, No. 01-2271 (10th Cir.)

9.    On February 13, 2002, the parties filed a Joint Motion for Stipulated Admission of Evidence, Briefing Schedule and Expedited Determination on the Merits. Through this motion, the parties agreed that this case could be decided on the merits based on the testimony and exhibits submitted in conjunction with Homans' motion for preliminary injunction, along with additional exhibits and stipulations submitted by the parties in their Joint Stipulation of Certain Evidence for Expedited Determination on the Merits, also filed February 13, 2002 (hereafter, "Joint Stipulation").

## FINDINGS OF FACT

### I.    ALBUQUERQUE'S SPENDING LIMITS SERVE NUMEROUS COMPELLING GOVERNMENTAL INTERESTS.

10.    The record demonstrates that Albuquerque's limits on campaign spending further several critical governmental objectives, including preventing political corruption and its appearance, preserving the public's confidence in the integrity of the political process, allowing candidates and elected officials to spend their time serving the public rather than engaging in fundraising, promoting voter interest in and connection to the electoral process, and promoting robust debate by fostering competitive elections.

**A.      Albuquerque's Spending Limits Serve The City's Compelling Interest In Deterring Corruption And The Appearance Of Corruption and Promoting Public Confidence in Government.**

### 1.  The Record Surrounding Adoption of the Limits.

11.      The City's adoption of spending limits in 1974 came against a backdrop of widespread public reports of campaign finance abuses and the corrosive effect of money and its influence in politics.  Although no formal legislative history exists for a municipal ordinance dating back to 1974, the City presented numerous Albuquerque newspaper articles from the period 1972 through 1974 which discuss the influence of money in politics and demonstrate public concern about the issue during the period leading up to the charter vote which adopted limits on spending and contributions.  Def. Ex. 5, pp. 5-1 through 5-47.

12.      During this period, City residents actually voted twice in favor of limits on campaign spending and contributions.  The first vote came on October 2, 1973, when voters in Albuquerque and Bernalillo County were presented with a proposal for merger of city and county government and a charter establishing the structure of the merged government.  The proposed charter included an election code with spending and contribution limits.  "Final Draft of Proposed City-County Charter," Albuquerque Journal, September 2, 1973, Def. Ex. 5, pp. 5-16, 5-17.  A majority of voters in the City of Albuquerque approved both the consolidation and the proposed charter, but consolidation did not go through because a majority of county residents voted against it.  "Charter Beaten," Albuquerque Journal, October 3, 1973, Def. Ex. 5, p. 5-23.

13.      A similar set of election regulations were then presented to Albuquerque voters again as part of a number of proposed amendments to the existing city charter.  "Proposed Charter Amendments for City Elections," Albuquerque Journal, January 20, 1974, E10 (Def. Ex. 5, pp. 5-33, 5-34).  The new election code, with limits on spending and contributions, were approved

4

by Albuquerque voters on February 26, 1974, winning over 90% support from city voters. "Election Code, Code of Ethics Win Approval," Albuquerque Journal, February 27, 1974, A1 (Def. Ex. 5, p. 5-45).

14. In explaining the charter proposals on government ethics and election regulations included in the proposed charter for the consolidated government, a member of the Charter Study Committee stated:

> Over the last 30 years I have watched the influence of big money on elections. And it has had a bad effect in two ways. It makes elected officials beholden to big money interests and it makes it necessary for candidates to seek out big money.

"Tough Election, Ethics Codes Are in Charter," Albuquerque Journal, September 9, 1973, A1 (Def. Ex. 5, p. 5-20). She also noted that "Albuquerque and Bernalillo County have gotten big enough and I think it is a very imminent danger that big financial interests will have more and more influence." *Id.* Similar statements appeared in numerous articles appearing during the debate on the proposed charter. *See* "Campaign Ethics Code Put Into Merger Plan," Albuquerque Journal, July 14, 1973, A1 (Def. Ex. 5, p. 5-11) (Study Committee member states "The general political climate through too many administrations has been gradually deteriorating.")

15. Editorial comment on the proposed charter also noted "the rich odor of corruption and the din of mediocrity which taints governmental units nationwide," and praised the proposed ethics and election code, quoting from the declaration of policy:

> "The proper administration of democratic government requires that public officials be independent, impartial and responsible to the people; that governmental decisions, and policy be made in the best interests of the people, the community and the government, and that the public have confidence in the integrity of its government."

5

"Reason to Vote Yes Tuesday," Albuquerque Journal, September 30, 1973, A4 (Def. Ex. 5, p. 5-22).

16.     Soon after county voters defeated the proposed consolidation despite the support of city voters, Albuquerque's City Commission approved proposed amendments to the city charter which would include a code of ethics and elections based on the proposals that had been made for the consolidated government.   "Commission Approves Revisions in Charter," Albuquerque Journal, January 12, 1974, A1-A2 (Def. Ex. 5, p. 5-31) (noting "The proposed changes follow the structure advocated for the consolidated city-county government.")

17.     The election code, which appeared on the ballot as Proposition 2, was endorsed by a broad variety of groups, including the Greater Albuquerque Chamber of Commerce as well as the League of Women Voters, Common Cause, the Democratic Party and Unity Party, and other groups, who also endorsed the proposed Ethics Code and a change to a mayor-council form of government.  Albuquerque Journal, February 18, 1974, A5 (Def. Ex. 5, p. 5-40); *see also* "Charter Vote Tuesday," Albuquerque Journal, February 24, 1974, A1, A12 (Def. Ex. 5, pp. 5-42-43).

18.     Editorial comment again noted that the new election code was needed to "deprive special interests of the means of 'buying' any candidate or any substantial claim to his loyalties," and that the election code "offers the potential of clearing the air of mistrust and suspicion in municipal politics and restoring a measure of public faith and confidence in governmental processes." Editorial, "For Proposition No. 2", Albuquerque Journal, February 18, 1974, A4 (Def. Ex. 5, p. 5-39).

19.     Other news articles and editorial comment appearing in Albuquerque newspapers during this time period also documented public concern over the corrosive impact of large

campaign contributions and expenditures in national and state races. *See, e.g.,* "Loopholes Weaken Campaign Laws," July 29, 1973, Albuquerque Journal, A4 (Def. Ex. 5, p. 5-9) (columnist noting that "much money is given by civic minded donors, but a great deal of it is an obvious attempt at influence buying"); "Campaign Time is Time for Payoffs," Albuquerque Journal, October 13, 1972, A4 (Def. Ex. 5, p. 5-1); Editorial, "Campaign Financing Disgrace," Albuquerque Journal, October 28, 1972, A4 (Def. Ex. 5-2); "Wealthy Continue to Aid Party War Chests," Albuquerque Journal, October 29, 1972, A1 (Def. Ex. 5, p. 5-3); "Tidy Sum of Out-of-State Money Flows Into State U.S. Senate Race," Albuquerque Journal, October 29, 1972, A1 (Def. Ex. 5, p. 5-5); "Tough Election, Ethics Codes Are In Charter," Albuquerque Journal, September 9, 1973, A1 (Def. Ex. 5, p. 5-20) (referring to Watergate scandal).

20.    In sum, the record demonstrates strong public concern over the corrupting influence of money on the political system and the problem of assuring public confidence in government at the time the spending limits were adopted.

## 2.    The Record Demonstrates That Albuquerque's Spending Limits Have Served to Deter the Reality and Appearance of Corruption and Promote Public Confidence in Government.

21.    Defendants also presented compelling evidence that Albuquerque's spending limits have served to deter the reality and appearance of corruption and to promote public confidence in the integrity of government, and that limits on spending remain necessary to serve these compelling governmental interests today.

22.    Defendants presented the results of survey research conducted among Albuquerque voters in 1998. Def. Ex. 2. The survey demonstrates that 84% of Albuquerque voters believe that campaigns for national office in New Mexico, which are not subject to spending limits, are too influenced by special interest money, with two-thirds of respondents

7

characterizing elections for national office as "dishonest." Def. Ex. 2, Survey Findings, p. 3 (questions 14, 15).

23.     By contrast, the majority of voters agree that local Albuquerque elections, which are conducted with limits on spending, are basically fair and honest. Def. Ex. 2, Survey Findings, p. 5 (questions 21, 22). Overwhelming majorities agree that local Albuquerque elections are less influenced by special interests than state and national elections. *Id.* (question 27). Overall, 87% percent of voters expressed support for maintaining limits on spending in Albuquerque elections. *Id.* (question 29).[1]

24.     The survey also demonstrated that, if Albuquerque's spending limits are removed, the great majority of voters believe that the potential for corruption will increase, ordinary citizens will be less able to run for office, and elected officials will spend more time listening to and raising money from special interests. *Id.*, p. 8 (questions 35, 37, 39, 40). Fifty-nine percent of Albuquerque voters say that they will have "less faith in the integrity of the election process in Albuquerque" if spending limits are removed. *Id.* (question 36).

25.     The findings set forth in this survey were echoed by those of an Albuquerque Journal poll conducted August 14-16, 2001, which found that 74% of respondents favored a cap on campaign expenditures. Def. Ex. 4, *Most Voters for Spending Caps*, Albuquerque Journal, August 20, 2001.

26.     Defendants also presented news articles illustrating how political money is currently deployed in elections for New Mexico state office and federal office to advance the legislative agenda of wealthy special interests. *See, e.g.*, "Campaign Donor Seeks N.M. Tax Breaks for Plant," Albuquerque Journal, February 14, 1999, A1 (Def. Ex. 5, p. 5-48-49 (lobbyist for waste company explains company's donations to both political parties and numerous House

8

and Senate candidates by noting that company planned a project in New Mexico and "[w]e didn't want to be strangers when we showed up with a request"); "Norwest Biggest Donor," Albuquerque Journal, October 15, 1999, D5 (Def. Ex. 5, p. 5-55) (Norwest spokesperson explains donations to state legislators by saying "There's always a political interest, of course. We wouldn't be giving if there weren't.")

Such incidents underscore why Albuquerque voters have greater confidence in the integrity of their city elections, which are subject to meaningful restraints on campaign spending.

27. A further indicator that Albuquerque's spending limits have promoted citizens' confidence in government is that voter turnout rates have remained higher in Albuquerque than in other cities without spending limits. According to a report prepared by Professor Anthony Gierzynski, a political scientist and nationally recognized scholar on campaign finance, average turnout in Albuquerque elections from 1974 to 1999 was 40.2%, compared to turnout rates for city elections across the country which are typically in the 25-35% range. Def. Ex. 1, Albuquerque Election Financing: An Analysis by Anthony Gierzynski, Ph.D. ("Gierzynski Report"), at 7 (attached to Declaration of Anthony Gierzynski, Ph.D.).

28. Compared to cities most similar to Albuquerque in terms of the timing of their municipal elections (odd-numbered years), Albuquerque generally has enjoyed an even greater turnout advantage. Id., Figure 2. For example, turnout in Pasadena in May of 1987 was 20%, and in Sacramento turnout was 33% in September 1987. Id. at 7. By comparison, turnout ranged from 40.4% to 51.3% in Albuquerque elections held in 1985 and 1989. Id., Figure 1. Further, Figure 2 of Professor Gierzynski's report compares Albuquerque turnout with that of other cities for which data could be found for the period 1988 through 1999, and demonstrates that

Albuquerque's turnout compared favorably with that of other cities during that period. *Id.* at 7-8 & Figure 2.

29.     The record also permits a comparison of turnout figures for the years when limits were in place for mayoral elections with those for the two mayoral elections in which the limits were enjoined. Based on the City's official turnout figures, the average turnout in Albuquerque mayoral general elections for which the spending limits were in place (1974, 1977, 1985, 1989, and 1993) was 43.1%, while the average turnout for the two years in which the limits were enjoined (1997 and 2001) was 37.7%. *See* Exhibit A to Joint Stipulation.

30.     Further, the lowest turnout in any mayoral election since 1974 occurred in one of the years when the spending limits were enjoined (1997). Def. Ex. 1, Gierzynski Report, at 8.

31.     A study by political science professor Donald A. Gross provides further support for this point. Professor Gross' empirical analysis of congressional elections indicates that simply increasing the amount of money in the campaign is as likely to reduce, as it is to increase, voter turnout. *See* Def. Ex. 8, Report of Dr. Donald A. Gross (hereafter, "Gross Report"), at 3 (attached to Declaration of Dr. Donald A. Gross).

32.     The fact that turnout was not precipitously low in the 2001 election (42.4%), when the limits were again enjoined, does not provide a reason to be sanguine about the long-term effect of eliminating Albuquerque's limits on campaign spending. The limits remained in place for part of the 2001 election, and given the legal uncertainties, only three of the eight mayoral candidates actually exceeded the limits. The candidate field in the 2001 Albuquerque election, and the results of the election, thus did not fully reflect the deleterious impact that unlimited campaign spending is likely to have in the long run. The evidence presented by defendants convincingly demonstrates that high-spending elections, over the long term, decrease

voter interest and confidence in the electoral process and deter electoral competition, directly contrary to the First Amendment goal of promoting an open and robust public debate.

### 3. The Federal Experience Demonstrates that Contribution Limits Alone, Without Limits on Spending, Are Inadequate to Deter Corruption and the Appearance of Corruption.

33. The federal experience with limited contributions and unlimited spending in congressional elections unequivocally demonstrates that contribution limits alone have failed to deter corruption and the appearance of corruption in congressional elections. This was detailed in the testimony and exhibits presented by Larry Makinson, Senior Researcher at the Center for Responsive Politics and one of the nation's leading experts on campaign finance. None of this evidence was available to the Supreme Court at the time of the *Buckley* decision.

34. Since the *Buckley* decision, campaign contributions to candidates have been limited to $1,000 per election, but spending has been unlimited. As Mr. Makinson explained, the federal regime of unlimited spending has left candidates locked in an "arms race" mentality in which each candidate feels compelled to raise the maximum amount possible to forestall the possibility of being outspent. In 1974, the average cost of a winning U.S. House campaign was $100,000, while in the 2000 elections the average winning campaign cost $840,000. Even when adjusted for inflation, this reflects an increase of over 400% in expenditures on a winning campaign. Tr. 17; Def. Ex. 14.

35. The federal experience also confirms that those who decline to participate whole-heartedly in raising huge amounts from special interests are seriously disadvantaged in competing for office. In the 2000 elections, the average winner outspent the average loser by close to three to one, with the average winner spending $840,000 and the average loser spending $300,000. In more than half the congressional districts in the country, the winning candidate

11

outspent the losing candidate by a factor of ten to one or more. Overall, ninety-six percent of winning House candidates outspent their opponents. Def. Ex. 16; Tr. 20-21.

36.     In a system in which election expenditures have increased so dramatically, contribution limits alone have not been effective in curbing undue influence by large donors. Fundraising is a constant and dominant preoccupation of members of Congress. During the peak fundraising season, it is not unusual for a member of Congress to go to three or four fund-raisers a night. The same problem exists at every level of government in the absence of spending limits. The more funds that candidates have to raise to remain competitive with their rivals, the more they have to depend on the continued good will of the people who put money into their campaigns. Tr. 22-23.

37.     Mr. Makinson explained how the problem of undue influence of large donors has not been solved by placing limits on the amount that any one individual can contribute. Techniques such as "bundling" allow special interests to funnel multiple contributions to candidates so that the candidate effectively receives thousands of dollars from one interest despite the limit on individual contributions. For example, a large number of executives and employees from the same corporation, often with their spouses and sometimes their children, each donate $1,000 to a candidate. They may coordinate the timing of the donations, or the candidate may do a fund-raiser sponsored by the company at which donations are collected. Sometimes, numerous checks may arrive in the same envelope. Although each check is considered an individual $1000 donation, the candidate understands quite well that one corporation or organization has effectively contributed thousands of dollars to his campaign. Tr. 26-27.

38. Bundling, however, encompasses a broader set of practices than merely presenting multiple checks in one envelope. The system of designating so-called "Pioneers" which the Bush campaign used in the 2000 elections, for example, is one way through which individual donors obtained "credit" for hard-money donations far in excess of the $1,000 individual limit. To become a "Pioneer," an individual was required to raise at least $100,000 for the campaign by soliciting donations from others. To make sure that would-be "Pioneers" were not exaggerating the amounts they were responsible for bringing in to the campaign, they would write on the check a code number to designate the "Pioneer" who brought in the contribution. Tr. 29. Those who can control one hundred $1,000 donors, or a thousand of them, obviously carry more clout than an individual giving $1,000. Not surprisingly, a number of the Bush "Pioneers" have since been named ambassadors to various countries. Tr. 29. Mr. Makinson pointed out that the Bush campaign practices were only an example of techniques used by many candidates facing an unlimited need for campaign funds. Tr. 29.

39. The Center for Responsive Politics has extensively tracked and documented how this broad array of bundling practices affects federal elections. This research shows that "the people who do this tend not to be random companies or random people in the country, but people that have a specific legislative agenda." Tr. 30. For example, in the 2000 presidential election, MBNA America, the nation's largest credit card company, bundled over $240,000 in donations to the Bush campaign; the list of MBNA-affiliated individual contributors is six pages long. Def. Ex. 17; Tr. 28-29. At the time of the campaign, MBNA had a critical legislative goal: pushing through a bankruptcy bill that would make it more difficult for debtors to declare bankruptcy. Tr. 30. Mr. Makinson also cited the oil and gas industry's donations to the 2000 Bush campaign

13

as an example of bundling that has aroused public suspicion that the government's energy policies may be based on "returning a favor" to donors. Tr. 30.

40.      Bundling is a bipartisan phenomenon; in the 1996 presidential election, a large accounting firm was the largest single bundler of donations to both the Clinton and Dole campaigns. Tr. 31. Further, bundling is practiced not only by single corporations or individuals, but also by entire industries that collectively have an interest in a public policy issue. Tr. 32.

41.      Patterns of contributions based on membership on powerful legislative committees demonstrate how pooled industry contributions have rendered contribution limits ineffective as a means of deterring undue influence and its appearance. For example, Def. Ex. 18 shows how members of the House Financial Services Committee (formerly known as the Banking Committee) collectively receive immense sums from the industries they regulate. In the 1999-2000 cycle, committee members received $2.3 million from real estate interests, $2.28 million from commercial banks, and $1.7 million from the securities and investment industry. Def. Ex. 18, p. 2. As Mr. Makinson explained,

> [T]here's quite a bit of competition to get on one of the money committees, because if you are, you're in a position to raise almost unlimited funds the next time you want to run. . . .
> And one of the things we also see, in tracking Congress, is when members of Congress are looking to raise the money that it takes to run in the next election, the first place they go to are the industries and the interests and the companies that are particularly paying attention to whatever their committee assignment is in Washington. And sometimes they can be rather blatant about it in sending out fundraising letters that prominently mention what their committee assignment is.

Tr. 33.

42.      The problem of bundling, which makes contribution limits ineffective,  is not caused by the so-called "soft-money" loophole.  Pending legislation to close that particular loophole would have no effect on the practices described in Mr. Makinson's testimony.  All of

the contributions cited in Mr. Makinson's testimony are "hard money" contributions, and the undue influence caused by such contributions would continue even if unlimited soft-money contributions were banned. As Mr. Makinson explained, "If the Congress got rid of soft money tomorrow and the President signed it the day after, we'd still have bundling, because that's hard money." Tr. 34.

43. Based on his extensive research, Mr. Makinson testified that the federal system of relying on contribution limits alone to stem the influence of large donors, without imposing limits on overall spending, has not worked. Tr. 34-35. "[T]he reality is, if you really do look at what the patterns are on how elections are financed, they're financed by people that have a stake in the decisions that are made by the lawmakers." Tr. 34-35. This means that, in addition to their voting constituents – the citizens who live in their district – elected officials must develop "a second set of constituents. You may call them the cash constituents." Tr. 39. On many less-publicized issues that come before Congress, "the only people paying attention are the cash constituents, and they're very persuasive when you're a member of Congress and you've got to raise $800,000 for the next election . . . . The more it costs, the more any legislator has to think about – very deep[ly] about . . . -- how they're going to vote." Tr. 39-40.

44. Mr. Makinson's testimony thus demonstrates that the federal limits on contributions have been inadequate to stem "the growing cynicism the public has about who is being represented in Washington." Tr. 34.

45. In sum, while the record before the *Buckley* Court in 1976 may have suggested that contribution limits alone were sufficient to limit the improper influence of money and insure citizens' faith in the integrity of government, the record in this case establishes the opposite.

**B.     Albuquerque's Spending Limits Serve a Compelling Governmental Interest Because They Permit Candidates And Officeholders to Spend Less Time Fundraising And More Time Interacting With Voters And Performing Official Duties.**

46.     The *Buckley* Court did not consider whether the governmental interest in preserving the time of officeholders from the demands of fundraising, so as better to perform their duties as representatives, would provide a compelling interest in limiting campaign spending. The record in this case strongly supports the conclusion that this interest is compelling and that Albuquerque's spending limits is necessary to serve this interest.

47.     When campaign spending is unlimited, as is true for congressional elections, fundraising becomes a full-time job for candidates and officeholders fearful of being outmatched by an opponent's spending. As Mr. Makinson explained, fundraising is a constant and dominant preoccupation of members of Congress. During the peak fundraising season, it is not unusual for a member of Congress to go to three or four fund-raisers a night. The same problem exists at every level of government in the absence of spending limits. The more funds that candidates have to raise to remain competitive with their rivals, the more they have to depend on the continued good will of the people who put money into their campaigns. Tr. 22-23.

48.     The declaration of Jim Baca, who ran for re-election as mayor in the 2001 election, establishes that unlimited spending will harm the Albuquerque political process in the same way. Commenting on the suspension of limits caused by the state-court injunction granted in May 2001, Mr. Baca stated as follows:

> As a result of this new money chase in this year's mayoral election in Albuquerque, I am now forced to spend three hours every day making fundraising phone calls. I have never before had to do this in my political career.
> This fundraising time takes me away from meeting voters and engaging in grassroots outreach throughout the city. When I call people who are doing business with the city, I am often concerned about the possibility of their misperception that they are being shaken down.

These fundraising pressures on my time also detract from my ability to carry out fully the duties of the office of the mayor for which I was elected.

Def. Ex. 9, Baca Declaration, ¶¶ 7-9.

49.     In addition, in the survey conducted among Albuquerque residents in 1998, voters expressed concern about this very issue. Seventy-eight percent of voters said that, if spending limits were removed, it was likely that "elected officials will have to spend more time raising campaign money and less time on their official duties." Def. Ex. 2, at 8, Question 40.

50.     Substantial additional evidence on this issue is also contained in Def. Ex. 6, Declaration of Martin Schram, with attached excerpts from his book *Speaking Freely: Former Members of Congress Talk About Money in Politics* 37-46 (1995). This book contains the results of interviews with former members of Congress, who detailed how the demands of fundraising draw time and attention of members of Congress away from their duties as legislators.

### C.     Spending Limits Will Serve The Compelling Governmental Interest In Increasing Voter Interest In And Connection To The Electoral System.

51.     The record also establishes that limiting candidate expenditures is likely to promote voter interest in and connection to the electoral process because it may encourage candidates to rely more upon forms of direct contact with voters. Defendants presented research by Professor Donald Gross, a political scientist at the University of Kentucky specializing in the study of campaign finance and congressional elections. Professor Gross's work demonstrates that high-spending campaigns do not stimulate voter participation. In fact, Professor Gross's study of survey data from the 1994 and 1996 congressional elections demonstrates that, "[i]n any given electoral setting, simply increasing the amount of money in the campaigns is as likely to reduce, as it is to increase, voter turnout." Def. Ex. 8, Gross Report, p. 3.

52.    By contrast with the ineffectiveness of campaign spending in stimulating participation, Professor Gross found that direct mobilization in the form of being contacted by a candidate or party is highly effective in stimulating voter participation.

53.    Professor Gross's study explains that there are several reasons why campaign spending is less effective than direct mobilization in stimulating voter turnout.  High spending campaigns tend to be media focused, leading citizens to view politics as a spectator sport.  High-spending advertising in campaigns is sometimes used to alienate voters and dampen turnout rather than to encourage participation.  Candidate resources, in addition, may often be spent in areas and on items that have little to do with actually communicating with voters.  High-spending campaigns also tend to add to citizen perceptions of corruption and the view that elections are for sale.  *Id.,* pp. 3-5.

54.    Spending limits thus can be expected to have a positive impact on voter participation because lower spending campaigns encourage candidates to place a greater reliance on direct forms of mobilization that are most effective in increasing voter turnout.  *Id.* at 6.  For this reason, Professor Gross concludes that "[i]t is the elimination of spending limits which is most likely to threaten the levels of voter participation seen in Albuquerque for the last twenty plus years."  *Id.* at 6.  This is consistent with Professor Gierzynski's findings, noted above, which show that Albuquerque's voter turnout has remained higher than that of other cities that do not have spending limits.  See ¶¶ 27-30, *supra.*

55.    The research of Professor Gross also showed that campaign spending does little to enhance voters' engagement with the electoral process.  Voter engagement is measured by such things as whether voters say that they are interested in the election, whether they care about the

results of the election, whether they are familiar with the candidates' names, and whether they know the positions or ideology of the candidates.

56. Professor Gross's study of the impact of spending in congressional elections found that increased campaign spending generally had no effect *or a negative effect* on voters' interest in the election, concern about the outcome of the election, and attentiveness to news reports about the campaign. Higher spending campaigns did not make citizens any more certain in their ideological placement of candidates than lower spending campaigns, and in some races, spending may have blurred voters' ability to determine such differences. *Id.* at 6. The only positive effect of spending was to increase voters' general familiarity with the candidate, but this did not translate into greater interest in or concern about the election. As Professor Gross notes:

> As a result, exposure to high spending House elections does little to connect citizens to the electoral process. In other words, in high spending campaigns, citizens may be more familiar with candidates, but they may care less, they may be less interested, they may pay less attention, and they may be less certain or able to distinguish the ideological leaning of candidates.

*Id.* at 7.

57. By contrast, Professor Gross found that direct mobilization in the form of being contacted by a candidate or political party had substantial positive effect on voters' overall engagement with the political process. In the 1994 elections he studied, for example, direct contact by a political candidate or party significantly increased respondents' interest in the congressional race, respondents' certainty about their ability to accurately place the candidates on ideological scales, and respondents' concern about the outcome of the election. Therefore, as Professor Gross concluded, "the more spending limits encourage candidates and parties to rely upon direct contacts with citizens, the more likely we are to see an increase in voter information, citizen concern with the election, and citizens' connection to the electoral process." *Id.* at 8.

19

58.     The declaration of Jim Baca, who served as mayor from 1997 through 2001, confirms how the removal of Albuquerque's spending limits threatens to reduce the kinds of grassroots campaigning that increases voter interest in campaigns.

As a result of this new money chase in this year's mayoral election in Albuquerque, I am now forced to spend three hours every day making fundraising phone calls. I have never before had to do this in my political career.

This fundraising time takes me away from meeting voters and engaging in grassroots outreach throughout the city.

Def. Ex. 9, ¶¶ 7-8.

59.     Another indicator of voter engagement is the extent to which small donors, as opposed to large donors, play a role in funding election campaigns. In Cincinnati, where spending is unlimited in city elections, 45% of all funds raised for city elections from 1991 to 1995 came from donors contributing at least $1,000, while only 8% of funds came from donors contributing less than $100.00. By contrast, in Albuquerque's elections from 1989-1997, only 27% of all funds came from donors contributing at least $1,000, and 16% came from donors contributing less than $100.00. Def. Ex. 20; *see also* Tr. at 45. In terms of the relative number of contributions coming from small donors, only 6% of donors gave less than $100.00 in Cincinnati's elections in 1995, while 53% of donors gave at least $1,000. In Albuquerque's 1995 election, 13% of donors gave less than $100.00, while only 27% gave $1,000 or more. Clearly, in Albuquerque, small donors are able to play a larger role in the electoral process.

60.     The evidence overall supports the conclusion that spending limits are likely to increase voter interest in and engagement with the electoral process. They are likely to

encourage greater reliance on direct forms of candidate interaction with the electorate that are more effective in stimulating voter participation and engagement.

**D.     Albuquerque's Spending Limits Promote an Open and Robust Public Debate by Encouraging Electoral Competition.**

61.     As noted in the study of Professor Donald Gross:

In many respects, the ultimate weapon of public accountability in a democratic system is the ability of citizens to remove political actors through elections. And, electoral competition is the mechanism that keeps accountability alive.

Electoral competition requires that voters be given a choice among at least two viable candidates. High levels of campaign spending pose a threat to such competition because large incumbent war chests tend to discourage serious challengers.

Def. Ex. 8, Gross Report, at 8; *see also* Def. Ex. 1, Gierzynski Report, at 11-12.

62.     With spending limits in place since 1974, Albuquerque's elections have been far more competitive than elections in most cities, with numerous challengers coming forward to seek city office. Def. Ex. 1, Gierzynski Report, at 6. Because of spending limits, incumbents do not build huge war chests to deter electoral competition in Albuquerque, and challengers have been far more successful in winning election against incumbents in Albuquerque than is true in other cities without spending limits. *Id.*

63.     In cities across the country, mayors seeking reelection typically enjoy a success rate of over 80%. Def. Ex. 1, Gierzynski Report at 6. In Albuquerque, where campaign spending has been subject to a cap, the success rate of incumbents seeking election is exactly 0% -- no incumbent mayor has ever been re-elected since 1974. *Id.* In city council races, the average incumbent success rate in elections nationwide from 1988 through 1996 was 86%; in Albuquerque, the success rate of city council incumbents between 1989 and 1999 was 71%. *Id.*

21

Clearly, under a regime of limited spending, incumbents in Albuquerque races have been more vulnerable to challenge than are the typical incumbents in mayoral or city council races.

64.    A comparison with New Mexico state legislative races, which have no spending limits, is also instructive. Between 1968 and 1995, only 60% of legislative races were contested at all, and only 30 percent were considered competitive (having a margin of victory of 20% or less). *Id.* at 7. By comparison, from 1974 to 1997, 100% of Albuquerque mayoral races were contested, with an average margin of victory of only 5.4% (7.4% for run-off elections). *Id.* at 6. In city council races from 1974 through 1999, 85.2% of contests had at least two serious competitors, with 63% of the races being competitive. *Id.*

65.    Mr. Makinson's testimony also substantiated the impact of unlimited spending in deterring competition for office at the federal level. "[I]t's had a deleterious effect on the competitiveness of elections." Tr. 36. "When half of those people [elected to the House] got there by spending ten times more than their opponent, the real election wasn't on election day. The real election was when people decided who they were going to put their money behind and one guy got all the money and the other guy didn't." Tr. 36.

66.    Even if a challenger is able to raise large sums, "the incumbent can still raise more." Tr. 38. This is in large part because sitting incumbents are already in a position to assist potential donors; they are "known quantities, so they can get as much money as they want." Tr. 38. Contributors know that "a contribution to an incumbent is one of the safest best you can make. . . ." Tr. 35. "And the value of what an elected official can deliver to a contributor is – is vastly larger than the sums of money that are involved in campaign contributions." Tr. 36.

67.    Defendants' Exhibit 19 further documents the advantage that incumbents enjoy in fundraising under the federal system of unlimited spending. It shows that business PACs

(political action committees), which donate far greater sums than labor or ideological PACs, gave 83% of their contributions to House incumbents in the 1999-2000 election cycle. Labor PACs and ideological PACs also favored incumbents in their contributions. Sixty-six percent of labor PAC contributions went to incumbents, with only 20% going to challengers and the rest going to candidates for open seats. Ideological PACs gave almost half their funds to incumbents, with 25% going to challengers and the rest to candidates in open seats. See also Tr. 40-41.

68.     Thus, in elections where spending is unlimited, incumbents typically enjoy a substantial funding advantage over challengers. In Albuquerque elections, however, Professor Gierzynski's report shows that the typical mayoral incumbent spent only $3,738 more than the typical challenger, for a spending ratio of 1.1 to 1. In city council elections, the incumbent-challenger spending ratio was the same: 1.1 to 1. By comparison, in medium-sized California cities (which do not have spending limits), the ratio of incumbent spending to challenger spending was 4.5 to 1. In Chicago aldermanic races, the comparable ratios were 5.7 to 1 in 1991 and 4.3 to 1 in 1995. In Seattle city council elections in 1997 and 1999, the ratio of median incumbent spending to median challenger spending was 14.5 to 1. *Id.* at 12. Again, the relative parity between incumbents and challengers has fostered competitiveness in Albuquerque city elections.

69.     As noted above, in the 2001 election, the limits remained in place for part of the election, and given the legal uncertainties, only three of the eight mayoral candidates actually exceeded the limits in 2001. The candidate field in the 2001 Albuquerque election, and the results of the election, thus did not fully reflect the anti-competitive impact that unlimited campaign spending is likely to have in the long run.

## II. ALBUQUERQUE'S SPENDING LIMITS ARE CLOSELY TAILORED TO SERVE THE CITY'S COMPELLING INTERESTS.

### A. The Spending Limits Permit Effective Campaigns for Mayor.

70.    The current spending limits for Albuquerque's mayoral and city council elections are extremely generous. Indeed, in 1999 they were doubled from their previous levels. Under the newly enacted limits, candidates for mayor and city council may spend an amount equal to twice the amount of the annual salary for those offices. Accordingly, candidates for mayor may now spend up to $174,720 (twice the annual salary of $87,360). Before these limits were increased in 1999, candidates were limited to spending an amount equal to the salary for the office in question.

71.    These generous limits are clearly more than adequate for running an effective campaign for mayor of Albuquerque. Indeed, during the mayoral election in 1997, candidates were free to spend an unlimited amount because the spending limits had been temporarily enjoined; yet the winning candidate, Jim Baca, spent only $106,000, the second-place candidate spent less than $80,000, and even the highest-spending candidate spent only $175,600, only a few hundred dollars more than the current limits would allow. Def. Ex. 10 & 11 (1997 candidates' campaign disclosures). This presents irrefutable evidence that higher spending simply is not necessary for running an effective campaign, and strongly supports the conclusion that the new limit of twice the mayor's annual salary is closely tailored to permit robust campaigns.

72.    By contending that an effective campaign for mayor requires an expenditure of $500,000 or more, plaintiff Homans necessarily contends that no previous candidate for mayor of Albuquerque ever ran an effective campaign prior to 2001 (since none had ever spent an amount anywhere close to that figure). Such an assertion simply cannot be credited.

24

73.     Indeed, it is undercut even by Homans' own evidence. For example, his evidence shows that billboard space on each of Albuquerque's two major interstate highways – which provides continual exposure to thousands of citizens every day – can be purchased for as little as $2,500 per month. *See* Plaintiff's Memorandum Brief in Support of Preliminary Injunction at 5. Further, Homans' campaign consultant has stated publicly that 30-second commercials on cable television can be purchased for less than $10 per airing, and that the upper-end cost for Homans' commercials had been around $400. Def. Ex. 7, "Mayoral Ad Campaign Blitz Starts Early," Albuquerque Journal, July 10, 2001, p. 2.

74.     The successful candidate in the 1997 mayoral race, Jim Baca, spent only $43,000 on television ads during his entire campaign; *see* Def. Ex. 9, Baca Declaration. As Mr. Baca's affidavit explains, there are many low-cost ways to reach out to voters in Albuquerque.

75.     In addition, if Albuquerque's spending limits were overly restrictive, one would expect to find almost all candidates spending the maximum allowable, and one would not expect to find winning candidates spending less than the limits. In Albuquerque mayoral races from 1989 to 1997, however, the pattern is quite different: in three out of five contests, including runoffs, the winner was not the top spender, and many competitive candidates did not spend the maximum allowed. Gierzynski Report, at 9; *see also* Figures 5 and 6. For city council elections, most competitive candidates from 1989 to 1999 spent less than the maximum allowed, including many of the victorious candidates. *Id.* at 9; *see also* Figures 3 and 4. In 1999, for example, three of the four winning city council candidates spent substantially less than the spending limit. *Id.*

76.     Further, in the 2001 elections, Bob Schwartz ran an effective campaign and finished a close second to the winner, Martin Chavez, while spending only $154,683.59, well

under the spending cap. *See* Stipulation ¶¶ 20, 29. Only three of the eight candidates spent in excess of the limits, and two of those three finished far behind Mr. Schwartz. *Id.*

77.     The fact that Albuquerque's spending limit will continue to rise to keep pace with increases in the mayor's salary also confirms the narrow tailoring of the city's limit. Because salary increases are typically provided to keep pace with inflation, this feature helps assure that the spending limit will also increase over time, and has essentially the same effect as adjusting the limits for inflation.

B.     **Albuquerque's Spending Limits Do Not Impede Effective Communication with Voters.**

78.     The evidence demonstrates that high-spending campaigns are not necessary to stimulate voter information about, or participation in, elections. As already noted above, Professor Gierzynski's report demonstrates that voter turnout in Albuquerque elections has been higher than turnout in comparable cities without spending limits. A study by political science professor Donald A. Gross provides further support for this point. Professor Gross' empirical analysis of congressional elections indicates that simply increasing the amount of money in the campaign is as likely to reduce, as it is to increase, voter turnout. *See* Def. Ex. 8, Gross Report, at 3.

79.     Further, Professor Gierzynski found that, in cities without spending limits, candidates generally spend a lower percentage of their overall funds on voter contact than is true of candidates in Albuquerque elections. Def. Ex. 1, Gierzynski Report at 14; *see also* Figure 5. Overall, about three-quarters of money spent by Albuquerque candidates from 1989 through 1999 was spent on voter contact, compared to about 50% of spending by candidates in medium-

sized California cities and in Seattle, and about 68% of spending by candidates in local New Jersey elections. *Id.*

80.     The evidence also showed that voters in Albuquerque place more importance on low-cost sources of campaign information than on expensive advertisements. When asked to identify sources of information they deemed "very important" in obtaining information about local Albuquerque elections, 62% of voters said that public debates and forums were very important, 48% said newspaper coverage was very important, 38% percent said that radio and television coverage were important, and 31% said that seeing the candidate in person was very important. By contrast, only 18% said that radio and television advertisements were very important, only 14% said that of newspaper advertisements, and only 13% said that of materials that come by mail. Def. Ex. 2, p. 2.

81.     Thus, the evidence available on this record demonstrates that high-spending campaigns are not necessary, and indeed are often detrimental, to the goal of an informed, politically active citizenry.

C.     **Spending Limits Are Closely Tailored Because Other Measures Are Inadequate to Serve the City's Compelling Governmental Interests.**

82.     Defendants' evidence persuasively demonstrates that contribution limits alone, unaccompanied by overall limits on campaign spending, have proven entirely ineffective to deter the reality and appearance of corruption and assure public confidence in government. *See* ¶¶ 21-45, *supra.* Further, contribution limits alone cannot serve the city's compelling interest in limiting the time that candidates and elected officials spend on fundraising. To overcome the "arms race" approach in which each candidate feels compelled to raise unlimited sums to prove his or her viability compared to other candidates, limits on campaign spending as well as contributions are indispensable. *See* ¶¶ 46-50, *supra.* In addition, the preceding findings have

also demonstrated that, without limits on spending, electoral competition and voter interest in elections are reduced, thus undermining the necessary conditions for a robust and meaningful debate of the issues. *See* ¶¶ 51-69, *supra.*

## CONCLUSIONS OF LAW

I.     **Albuquerque's Limit On Campaign Expenditures Serves Compelling Governmental Interests And Is Permissible Under The First Amendment.**

83.     Based on the record presented in this case, the Court concludes that Albuquerque's limit on spending in mayoral campaigns is closely tailored to serve compelling governmental interests. It therefore withstands plaintiff's First Amendment challenge. These Conclusions of Law first address the Supreme Court's holding in *Buckley*, and then turn to the interests the City has identified to support the constitutionality of its spending limit. Lastly, the Conclusions of Law address the close tailoring of the spending limit.

A.     ***Buckley v. Valeo* does not automatically invalidate all limits on campaign spending.**

84.     In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court held that the congressional spending limits established by FECA should be given "exacting scrutiny" because of their potential impact on First Amendment rights of political expression, 424 U.S. at 44-45, and ruled that the FECA limits were not justified based on the record before the Court. *Buckley*, however, did not announce a *per se* ban on any and all limits on campaign spending.

85.     Exacting scrutiny of limits on campaign spending is *not* the same as a *per se* ban on such limits. The facts are important even when courts are applying the strictest standard of constitutional review. In recent years, the Supreme Court has upheld a number of electoral regulations against First Amendment challenge even while applying strict scrutiny. *See Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) (applying strict scrutiny to Michigan statute restricting independent expenditures by corporations in political campaigns, but

28

upholding restriction); *Burson v. Freeman*, 504 U.S. 191 (1992) (applying strict scrutiny to state ban on electioneering activity near polling places, but upholding ban). As the Court has cautioned: "[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring in judgment)).

86.    Even decisions striking down particular campaign restrictions demonstrate that the constitutionality of a restriction is factually contingent, not based on *per se* rules. For example, in *Colorado Republican,* the Court said: "the lack of coordination between the candidate and the source of the expenditure . . . prevents us from assuming, *absent convincing evidence to the contrary,* that a limitation on political parties' independent expenditures is necessary to combat a substantial danger of corruption in the electoral system." 518 U.S. at 617 (emphasis added).

87.    In *Buckley v. Valeo*, the Supreme Court addressed the constitutionality of the Federal Election Campaign Act of 1974 ("FECA"). Among other provisions, FECA placed limits on the amounts that donors could contribute to candidates *and* on the amount that candidates could spend on their campaigns. The *Buckley* Court acknowledged that government has a compelling interest in deterring corruption and the appearance of corruption of elected officials. *See Buckley,* 424 U.S. at 23-38. On that basis, *Buckley* upheld FECA's limits on the amount that donors can contribute to candidates. 424 U.S. at 20-38. The Court nevertheless struck down the limits on overall campaign spending, concluding, on the record before it, that the contribution limits of FECA alone would be sufficient to deter corruption and the appearance of corruption.

88.     *Buckley's* discussion of whether FECA's spending limits were necessary to deter corruption or the appearance of corruption demonstrates the factually contingent nature of the Court's ruling on this point.  While the appellate court in *Buckley* had ruled that "the expenditure restrictions [of FECA] are necessary to reduce the incentive to circumvent direct contribution limits," the Supreme Court found:  "There is no indication [in the record] that the substantial criminal penalties for violating the contribution ceilings combined with the political repercussion of such violations will be insufficient to police the contribution provisions." *Buckley*, 424 U.S. at 55-56.  Thus, the assertion that spending caps were a necessary concomitant to contribution limits was rejected in *Buckley* only as a matter of fact, not of law.

89.     Because the Court rejected the need for spending limits as a factual matter, rather than as a matter of law, it left the door open to upholding spending limits on a different factual record.  As noted in the concurring opinion of Judge Avern Cohn in *Kruse v. City of Cincinnati*, 142 F.3d 907, 920 (6th Cir.), *cert. denied*, 525 U.S. 1001 (1998):

> The Supreme Court's decision in *Buckley* . . . is not a broad pronouncement declaring all campaign expenditure limits unconstitutional.  It may be that the interest in freeing officeholders from the pressures of fundraising so they can perform their duties, or the interest in preserving faith in our democracy, is compelling, and that campaign expenditure limits are a narrowly tailored means of serving such an interest.

(concurring opinion of Cohn, D.J., sitting by designation).

90.     In addition to leaving open the possibility of a different factual record supporting the necessity of limits on spending as an anti-corruption measure, *Buckley* left the door open to identifying new and compelling governmental interests, not specifically rejected in *Buckley*, that could justify the enactment of campaign spending limits.  The *Buckley* Court carefully listed the three specific governmental interests that had been offered as justifying the FECA's limits on congressional campaign spending limits:  (1) deterring corruption and preventing evasion of the

contribution limits; (2) equalizing the financial resources of candidates; and (3) restraining the cost of election campaigns for its own sake. *See Buckley*, 424 U.S. at 55-56. While rejecting these interests as a basis for the particular limits contained in FECA, the Court did not hold that there could never be a new and compelling governmental interest that could justify campaign spending limits. Rather, the Court stated: "No governmental interest *that has been suggested* is sufficient to justify [the congressional spending limits]." 424 U.S. at 55 (emphasis added). This clearly leaves the door open for courts to consider different compelling interests as a basis for upholding spending limits.

91.    In the 26 years since *Buckley*, the Supreme Court has not again reviewed any statutory scheme establishing limits on the amount that candidates may spend on their election campaigns. In the Court's most recent cases addressing other campaign finance issues, however, a total of four Justices have now gone on record suggesting (or stating outright) that neither *Buckley* nor the First Amendment should be read as an inflexible bar to campaign finance regulation, even with respect to spending limits. *SeeNixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 405 (2000) (concurring opinion of Breyer, J., joined by Ginsburg, J.) (calling for approach that balances competing constitutional interests and stating "it might prove possible to reinterpret aspects of *Buckley* in light of the post-*Buckley* experience stressed by Justice Kennedy, making less absolute the contribution/expenditure line, particularly in respect to independently wealthy candidates, whose expenditures might be considered contributions to their own campaigns"); *id.* at 409 (Kennedy, J., dissenting) (noting difficulty of constitutional issues surrounding campaign regulation but stating, "For now, however, I would leave open the possibility that Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions, thus permitting officeholders to concentrate their

time and efforts on official duties rather than on fundraising"); *Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604, 649-50 (1996) (Stevens, J., joined by Ginsburg, J., dissenting) ("It is quite wrong to assume that the net effect of limits on contributions and expenditures – which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fund-raising, and to diminish the importance of repetitive 30-second commercials – will be adverse to the interest in informed debate protected by the First Amendment."). *See also Federal Election Comm'n v. Colorado Republican Federal Campaign Committee*, 531 U.S. 923, 121 S. Ct. 2351, 2359 n.8 (2001) (noting that, while the FEC had not asked the Court in that case to revisit *Buckley*'s general approach to expenditure limits, "some have argued that such limits could be justified in light of post-Buckley developments in campaign finance") (citations omitted).

92.    Two justices have taken the opposite position, stating that limits on contributions, as well as limits on spending, violate the First Amendment.  *Nixon*, 528 U.S. at 410-430 (Thomas, J., joined by Scalia, J., dissenting).  The remaining justices, Chief Justice Rehnquist, Justice O'Connor, and Justice Souter, have refrained from taking any position on whether the First Amendment presents a *per se* bar to any legislation limiting spending in candidate campaigns.

93.    The conclusion that *Buckley* is not an absolute ban on spending limits does not depend on counting up the four concurrences and dissents in *Nixon* and *Colorado Republican* described above.  The fact that *Buckley* leaves the door open to the constitutionality of spending limits, instead, is established by analysis of *Buckley* itself, and by the nature of exacting scrutiny as applied by a majority of the Supreme Court in cases such as *Austin v. Michigan Chamber of Commerce* and *Burson v. Freeman*.

94.     The Supreme Court decisions in *FEC v. National Conservative Political Action Committee*, 470 U.S. 480 (1985) and *Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604 (1996), address only the constitutionality of limits on *independent expenditures* by political action committees and political parties, not limits on spending by candidates themselves.

95.     Lower federal court judges have questioned whether *Buckley* stands as a *per se* bar to the constitutionality of spending limits.  For example, although the U.S. Court of Appeals struck down spending limits enacted by the City of Cincinnati, a concurring opinion by Judge Cohn in that case recognized that, on the right factual record, limits on spending could be upheld consistent with *Buckley* and the First Amendment.  *Kruse v. City of Cincinnati*, 142 F.3d at 919. More recently, U.S. District Judge William K. Sessions, III, noted that

> Spending limits are an effective response to certain compelling governmental interests not addressed in *Buckley*:  (1) "Freeing office holders so they can perform their duties," in the words of Judge Cohn, *Kruse[ v. City of Cincinnati]*, 142 F.3d at 920, or as Justice Kennedy put it, "permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising," *Shrink*, 120 S.Ct. at 916; (2) "[P]reserving faith in our democracy," *Kruse*, 142 F.3d at 920; (3) "[P]rotecting access to the political arena" as stated by [Justice] Stevens, *Colorado Republican*, 518 U.S. at 649-650; and (4) "diminish[ing] the importance of repetitive 30-second commercials." *Id.*

*Landell v. Sorrell*, 118 F. Supp. 2d 459, 482 (D. Vt. 2000).  While Judge Sessions ultimately struck down Vermont's spending limits on the authority of *Buckley*, he took note of the more recent Supreme Court commentary in the *Nixon* and *Colorado Republican* decisions and observed that "[p]owerful, if not controlling, judicial commentary such as this reinforces the view that the constitutionality of expenditure limits bears review and reconsideration." *Landell v. Sorrell*, 118 F. Supp. 2d at 482.

96.     The order of the 10th Circuit motions panel granting plaintiff's emergency request for an injunction pending appeal stated that plaintiff had established a likelihood of success on the merits, noting that *Buckley* demands "exacting scrutiny" of spending limits. 246 F.3d at 1243 (quoting *Buckley v. Valeo*, 424 U.S. at 54-55). The decision of a motions panel on an emergency motion for an injunction pending appeal, however, does not constitute a binding decision that the plaintiff is entitled to permanent injunctive relief. *See American Civil Liberties Union of New Jerseyv. Black Horse Pike Regional Board of Education*, 84 F.3d 1471, 1476-77 (3d Cir. 1996) (en banc) (district court erred in concluding that it was bound to enter permanent injunction in favor of plaintiffs based on emergency ruling of court of appeals granting plaintiffs' motion for preliminary injunction, even when record on request for permanent injunction was identical to record on request for preliminary injunction). As noted in *ACLU of New Jersey*, the court of appeals' emergency order "was based on an assessment of the *likelihood* that plaintiffs would succeed on the merits, and neither constitutes nor substitutes for an actual finding that plaintiffs have succeeded on the merits and are entitled to permanent relief." 84 F.3d at 1477 (emphasis in original).

97.     Further, while the 10th Circuit's ruling noted that spending limits had been struck down in *Kruse v. City of Cincinnati* and in *Landell v. Sorrell*, the ruling does not state that *Buckley* created a *per se* rule which automatically requires invalidation of any and all limits on campaign spending, regardless of the facts. In addition, this Court is now able to undertake a more comprehensive examination of the factual record than was possible in light of the time constraints created by plaintiff's request for emergency pre-election relief at the time of the injunction motion. Accordingly, it remains open to this Court to determine that, based upon the factual record showing how spending limits have actually operated in Albuquerque since 1974,

and/or based upon new and compelling governmental interests not identified in *Buckley*, Albuquerque's limit on campaign spending in mayoral elections survives First Amendment scrutiny.

**B.     Albuquerque's Spending Limit Is Necessary to Serve The City's Compelling Interest In Deterring Corruption And The Appearance Of Corruption and Promoting Public Confidence in Government.**

99.     The Court concludes that Albuquerque's spending limit is necessary to serve the City's compelling interest in deterring the reality and appearance of corruption and promoting public confidence in government.

100.     *Buckley* and subsequent Supreme Court decisions recognize the strong governmental interest in avoiding not only actual *quid pro quo* corruption of elected officials, but also the appearance of corruption. "Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.'" *Buckley*, 424 U.S. at 27 (quoting *U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973)).

101.     While the record before the *Buckley* Court in 1976 may have suggested that contribution limits alone would be sufficient to limit the improper influence of money and insure citizens' faith in the integrity of government, the record in this case emphatically refutes any such conclusion.     The factual findings set forth in ¶¶ 21-45, *supra*, demonstrate that Albuquerque's strong interest in deterring the reality and appearance of corruption, and assuring citizen confidence in government, cannot be served through limits on contributions alone, and that Albuquerque's limit on overall campaign spending must remain in place to serve this interest.

102.    The record before the *Buckley* Court did not include proof, for example, that voter participation was higher in a city with spending limits in place than in cities with no limits on expenditures. It also did not include proof of the federal experience with relying on contribution limits alone to deter the reality and appearance of corruption for the past quarter-century – proof which demonstrates that contribution limits alone have been utterly ineffective in preventing wealthy special interests from exercising undue influence in federal elections. It did not include survey results such as those available here, showing the positive impact on public confidence when elections are actually conducted subject to limits on campaign spending.[2]

103.    For all these reasons, the Court concludes that Albuquerque's limit on campaign spending is necessary to serve the City's compelling interest in deterring the reality and appearance of corruption and preserving public confidence in government.

**C.      Albuquerque's Spending Limit Is Constitutional Because It Permits Candidates And Officeholders to Spend Less Time Fundraising And More Time Performing Their Duties as Representatives and Interacting With Voters.**

104.    Certain governmental interests that might prompt a jurisdiction to adopt spending limits simply were not addressed by the *Buckley* Court, and thus are not foreclosed as a potential basis for upholding such limits. For example, the *Buckley* Court did not consider whether the governmental interest in preserving the time of officeholders from the demands of fundraising, so as better to perform their duties as representatives, would provide a compelling interest in limiting campaign spending. *SeeKruse*, 142 F.3d at 920 (Cohn, D.J., concurring):

> The Supreme Court's decision in *Buckley* . . . is not a broad pronouncement declaring all campaign expenditure limits unconstitutional. It may be that the interest in freeing officeholders from the pressures of fundraising so they can perform their duties, or the interest in preserving faith in our democracy, is compelling, and that campaign expenditure limits are a narrowly tailored means of serving such an interest.

*Id.* at 920. *See also Nixon*, 120 S.Ct. at 916 ("For now, however, I would leave open the possibility that Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions, thus permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising") (Kennedy, J., dissenting); Vincent Blasi, *Free Speech and the Widening Gyre of Fund-Raising: Why Campaign Spending Limits May Not Violate the First Amendment After All*, 94 COLUM. L. REV. 1281 (1994) (setting forth compelling nature of this interest as basis for upholding campaign spending limits); Richard Briffault, *Nixon v. Shrink Missouri Government PAC: The Beginning of the End of the Buckley Era?*, 85 Minn. L. Rev. 1729, 1769-70 (2001) (noting that expenditure limitations may serve the important goal of reducing the burdens and distractions of fundraising).

105. Notably, the 10th Circuit's order granting plaintiff's motion for an injunction pending appeal did not mention this interest as a potential basis for limits on campaign spending, because it viewed this Court's decision as identifying only two compelling interests supporting spending limits, namely, "preserving faith in democracy and deterring the appearance of corruption." 246 F.3d at 1244. Clearly, the interest in preserving the time of officeholders so that they may fulfill their duties as representatives provides a strong, independent basis for spending limits that was not addressed in *Buckley* and is fully supported by the record in this case. *See* ¶¶, 46-50, *supra.*

D. **Albuquerque's Spending Limit Serves The City's Compelling Interest In Increasing Voter Interest In And Connection To The Electoral System.**

106. The City's limit on campaign spending is also justified as a means of promoting greater reliance on direct forms of voter mobilization which enhance voter interest in and connection to the electoral process. The evidence demonstrates that mobilization of voters

through direct contact by a candidate or political party is more effective than high levels of campaign spending in stimulating voter turnout. It also increases the likelihood that voters will be interested in the race, aware of the candidates' positions, and concerned about the outcome of the race. *See* ¶¶51-60, *supra*. High levels of campaign spending, however, require candidates to devote more and more time to fundraising, to the detriment of grassroots outreach and mobilization. *See* Def. Ex. 9, ¶¶ 7-8 (Baca Declaration). By encouraging more reliance on lower-cost, grassroots outreach, rather than high-cost advertisements that bypass this type of direct contact, Albuquerque's spending limit serves the compelling interest in promoting voter interest in and engagement with the electoral process. *Cf.Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983) (noting, in context of ballot access restrictions: "There can be no question about the legitimacy of the state's interest in fostering informed and educated expressions of the popular will in a general election.").

**E.     Albuquerque's Spending Limits Promote an Open and Robust Public Debate by Encouraging Electoral Competition.**

107.     Electoral competition is the indispensable condition for a full and robust debate of the issues and for assuring that elected official remain accountable to the voters. High-spending campaigns that deter challengers from entering a race thus effectively censor political speech by eliminating the conditions for a meaningful debate of the issues in a competitive election. *See alsoBriffault, The Beginning of the End of the Buckley Era?,* 85 Minn. L. Rev. at 1766 ("The burdens of fundraising may not just limit challenger finances, but may also discourage many potential challengers from entering the race altogether.") The evidence in this case strongly supports the conclusion that Albuquerque's limit on campaign spending, by encouraging electoral competition, furthers the compelling governmental interest in promoting a robust debate of the issues and greater accountability of elected officials to their constituents. *See* ¶¶ 61-69,

*supra.See also* Briffault, *The Beginning of the End of the Buckley Era?*, 85 Minn. L. Rev. at 1770 ("Greater judicial attention to competitiveness as a constitutional concern in campaign finance regulation, thus, could increase judicial willingness to validate reasonable spending limits, that is, limits pegged to the costs of mounting effective campaigns.").

108.    The evidence presented by defendants convincingly demonstrates that high-spending elections, over the long term, will deter electoral competition and reduce voter interest and confidence in the electoral process, directly contrary to the First Amendment goal of promoting an open and robust public debate. Albuquerque should not have to await this kind of damage to its political system, but should be permitted to maintain campaign finance regulations that have produced healthy, competitive elections with high voter turnout and strong public confidence in government.

## II.    ALBUQUERQUE'S SPENDING LIMIT IS CLOSELY TAILORED TO SERVE THE CITY'S COMPELLING INTERESTS.

### A.    Albuquerque's Spending Limit Permits Effective Campaigns.

109.    Albuquerque's spending limit is closely drawn to serve the interests identified above. The expenditure limit is set at a level that is more than adequate to permit vigorous and effective campaigns for mayor. Findings of Fact, Part I.A, *supra*. The limit is high enough to permit effective communication with the voters. Findings of Fact, Part I.B., *supra*.

110.    The Court further concludes that Albuquerque's spending limit is closely tailored because the record demonstrates that the City's compelling interests cannot be achieved through other means, such as imposing limits on contributions alone. Findings, of Fact, Part I.C., *supra*.

## CONCLUSION

For the reasons set forth above, and on the basis of the foregoing authorities, Albuquerque's limits on campaign spending are fully constitutional under the First Amendment

(made applicable to the states by the Fourteenth Amendment), and do not violate 42 U.S.C. §

1983. In addition, plaintiff has not demonstrated that the limits violate any provision of the New

Mexico Constitution. Accordingly, judgment will be entered for defendants.

Respectfully submitted,

Brenda Wright                           CITY OF ALBUQUERQUE
John C. Bonifaz                         Robert M. White
National Voting Rights Institute        City Attorney
One Bromfield Street, Third Floor
Boston, MA 02108
(617) 368-9100
                                        Randy M. Autio
                                        Assistant City Attorney
                                        P.O. Box 2248
                                        Albuquerque, NM 87103
                                        (505) 768-4500


Counsel for Defendants

I hereby certify that a true and correct copy
of the foregoing was sent to counsel of
record this ____ day of March, 2002.

Randy M. Autio

[1] The survey asked voters whether they favor or oppose the law setting limits on mayoral and city council races. 87% of respondents stated that they favor the law. As a follow-up question, respondents were asked to say whether they "strongly favor" or "not so strongly" favor; this breakdown of favorable responses was 62% "strongly favor" and 25% "not so strongly favor." Only 9% of respondents said they were strongly opposed to the law, with 6% strongly opposed. *Id.*

[2] Opinion polls and other barometers of public sentiment, such as votes on campaign finance referenda, are relevant sources of evidence for courts assessing the validity of campaign finance laws. *Nixon,* 528 U.S. at 394; *Daggett v. Comm'n on Governmental Ethics and Elections*, 205 F.3d 445, 457-58 (1st Cir. 2000).