IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RICK HOMANS,

    Plaintiff,

vs.                                                    No. CIV 01-917 MV/RLP

THE CITY OF ALBUQUERQUE, a Municipal
Corporation and MARGIE BACA ARCHULETA
in her capacity as Clerk of the City of Albuquerque,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** is before the Court on the parties' Joint Motion for Stipulated Admission of Evidence, Briefing Schedule and Expedited Determination on the Merits **[Doc. No. 35]**. The Court, having considered the motion, the pleadings, testimony in connection with plaintiff's motion for a preliminary injunction, joint stipulation of certain evidence for expedited determination on the merits, exhibits, relevant law, and being otherwise fully informed, finds that the parties' joint motion is well-taken and will be **GRANTED**, and that, under the Tenth Circuit's interpretation of *Buckley v. Valeo*, 424 U.S. 1 (1976), plaintiff is entitled to (1) a declaratory judgment that Article XIII, Section 4(d)(2) of the Albuquerque City Charter violates the First Amendment to the United States Constitution and (2) a permanent injunction enjoining the enforcement of the expenditure limitations under Article XIII, Section 4(d)(2) of the Albuquerque City Charter.

### I. BACKGROUND

Rick Homans was a duly qualified candidate for Mayor in the City of Albuquerque, New Mexico (the "City"), whose name appeared on the printed ballot for the mayoral election held

October 2, 2001. Mr. Homans brought this action seeking a declaratory judgment that Article XIII, Section 4(d)(2) of the Albuquerque City Charter (the "City Charter") violates the First Amendment to the United States Constitution. That Section states:

> (d) No candidate shall allow contributions or make expenditures in excess of the following for any election:
>
>     \*    \*    \*
>
> (2) To a candidate for the office of Mayor contributions or expenditures equal to twice the amount of the annual salary paid by the City of Albuquerque to the Mayor as of the date of filing of the Declaration of Candidacy.

The annual salary of the Mayor in office at the time of the October 2, 2001 election was $87,360. Therefore, the expenditure limitation for the October 2, 2001 mayoral election was $174,720. Under the terms of the City Charter, Article XIII, Section 4(d)(2), Mr. Homans was subject to a $500 fine for each violation of the expenditure limitations, and, if he had won the election, would have been subject to potential public reprimand and removal from office by the City Council for any such violation.

Prior to Mr. Homans's registration of his candidacy for Mayor, a state court issued a preliminary injunction which prevented enforcement of the expenditure limitations at issue herein. When Mr. Homans received informational materials from the City regarding his candidacy, he was verbally informed by a City employee that the expenditure limits would not be enforced. Three voters had brought the state court action. A candidate intervened in the action and argued that the voters lacked standing to bring suit. The state court agreed and gave the candidates twenty days to join the lawsuit before it would be dismissed for lack of standing. Neither Mr. Homans nor any other candidate joined, and the case was dismissed on August 15, 2001.

Plaintiff commenced the instant action, filing a complaint for declaratory judgment and injunctive relief **[Doc. No. 1],** on August 10, 2001. Thereafter, on August 13, 2001, plaintiff filed a motion for a preliminary injunction and a temporary restraining order **[Doc. No. 3]**, seeking an order enjoining enforcement of the expenditure limitation provision of the City Charter. In support of his motions, Mr. Homans claimed that the City Charter was an unconstitutional infringement on his First Amendment rights. He contended that, in reliance on a City employee's assertion that the limits would not be enforced in this election, he had already exceeded the City Charter's expenditure limits. He further claimed that if the expenditure limits were not enjoined, he would have to stop campaigning and close his campaign headquarters. The City maintained that the City Charter was a constitutional limitation on campaign spending and that enforcement of the limitation would not cause Mr. Homans irreparable injury.

This Court held a hearing on August 20, 2001, for the purpose of determining whether Mr. Homans was entitled to temporary injunctive relief. Based on the record before the Court at that time, the Court found that Mr. Homans had shown a likelihood of success on the merits of his claim that the City Charter violated the First Amendment, that he would suffer irreparable harm if enforcement of the City Charter were not enjoined, and that the balance of harms and the public interest weighed in his favor. Thus, the Court granted Mr. Homans's motion for temporary injunctive relief **[Doc. No. 17]**.

The Court held another hearing on August 30, 2001, for the purpose of determining whether Mr. Homans was entitled to preliminary injunctive relief. By this time, the Court had had the opportunity to review the evidence submitted by the City in opposition to Mr. Homans's motion. At the hearing, the Court heard the testimony of Mr. Larry Makinson, an expert on election reform from

3

the Center for Responsive Politics. The Court also heard argument from counsel for both parties on the issue of whether Mr. Homans was entitled to preliminary injunctive relief.

After the second hearing, the Court denied Mr. Homans's request for a preliminary injunction, finding that Mr. Homans had not shown a likelihood of prevailing on the merits ("Preliminary Injunction Memorandum Opinion") **[Doc. No. 21]**. The Court determined that *Buckley v. Valeo*, 424 U.S. 1 (1976), did not present an absolute bar to expenditure limits, and that the relevant City Charter expenditure provision was narrowly tailored to meet the compelling governmental interests of preserving the public faith in democracy and reducing the appearance of corruption. The Court further found that Mr. Homans had made a sufficient showing of irreparable harm, that the balance of harms weighed in favor of Mr. Homans, and that the public interest favored the City.

On September 4, 2001, Mr. Homans filed an interlocutory appeal of this Court's denial of a preliminary injunction **[Doc. No. 25]**. Mr. Homans also filed with the Tenth Circuit Court of Appeals an emergency motion for an injunction pending appeal, and an alternative motion for suspension of the appellate rules and expedited review of the district court's denial of his application for a preliminary injunction. In a *per curiam* order dated September 6, 2001, the Tenth Circuit granted Mr. Homans's emergency motion for an injunction pending appeal, and enjoined the City from further enforcing Article XIII, Section 4(d)(2) of the City Charter. The Tenth Circuit found that Mr. Homans had demonstrated a substantial likelihood of success on the merits on his First Amendment claim that campaign expenditure limitations are unconstitutional. Additionally, the Tenth Circuit agreed with this Court's findings that Mr. Homans had made a sufficient showing of irreparable harm and that the balance of harms weighed in favor of Mr. Homans.

Thereafter, based on the parties' agreement, the Tenth Circuit suspended the appeal pending entry of final judgment in this Court **[Doc. No. 29]**. The parties then filed a joint motion for stipulated admission of evidence, briefing schedule and expedited determination on the merits **[Doc. No. 35]**, requesting, *inter alia*, that this matter be decided on the merits without a trial based upon the evidentiary record developed in connection with Mr. Homans's motion for temporary restraining order and motion for preliminary injunction. The parties further agreed to the admission of the evidence and factual stipulations set forth in the parties' joint stipulation for admission of certain evidence for expedited determination on the merits ("Stip.") **[Doc. No. 36]**, which was filed simultaneously with the joint motion.

## II. FINDINGS OF FACT

1. Mr. Homans is a resident of the City. Stip. at ¶1.

2. The City is a municipal corporation organized under the laws of the State of New Mexico and is a "person" within the meaning of 42 U.S.C. § 1983. Stip. at ¶2.

3. Francie D. Cordova is the Clerk of the City (the "Clerk") and is charged with enforcement of certain ordinances relating to City elections and is a "person" within the meaning of 42 U.S.C. § 1983. Ms. Cordova succeeded defendant Margie Baca Archuleta as the Clerk on December 1, 2001. Stip. at ¶3.

4. The City's expenditure limits were enacted in 1974. Stip. at ¶12, Def. Ex. 1 at 4.

5. Limits on candidate spending remained in effect for each mayoral and city council election held from 1974 through 1995. Stip. at ¶13.

6. The spending limits were temporarily enjoined for the 1997 elections by a court order in *Murphy v. City of Albuquerque*, No. CV-97-0007826 (2d Judicial Dist.). Stip. at ¶14.

7. Studies of the temporary removal of the limits show a correlation to a significant decrease in voter turnout. *See* Def. Ex. 1 at 8.

8. The spending limits were restored for the 1999 city council elections after the plaintiffs in *Murphy* withdrew their lawsuit through a stipulated dismissal. Stip. at ¶15.

9. The City Charter was amended in 1999 to permit candidates for Mayor and city council to spend up to twice the annual salary of the office in their election campaigns. Stip. at ¶16.

10. The City is one of the few remaining cities in the United States that limits the amount of money a candidate for political office may spend on his or her own campaign. *See* John C. Bonifaz, et al., *Challenging Buckley v. Valeo: A Legal Strategy*, 33 Akron L. Rev. 39, 56 (1999).

11. A system of unlimited spending has deleterious effects on the competitiveness of elections because it gives incumbent candidates an electoral advantage. *See* Tr. at 37-44.

12. Nationwide, eighty-eight percent (88%) of incumbent Mayors successfully sought reelection in 1999. *See* Def. Ex. 1 at 6. In contrast, since 1974, the City has had a zero percent (0%) success rate for Mayors seeking reelection. *See id.*

13. Many successful candidates for the office of Mayor of the City have spent far less than the maximum expenditure allowed. *See* Def. Exs. 10 & 11.

14. The prior Mayor of the City, Jim Baca, ran a successful campaign for Mayor in 1997, winning the election after spending only $43,888.26 on television advertising. *See* Def. Ex 9, ¶ 3. During that campaign, Mayor Baca relied primarily on grassroots outreach rather than on television advertising. *See id.* at ¶¶ 2-3.

15. Between 1991 and 1995, in Cincinnati, where there are no expenditure limits, forty-five percent (45%) of all funds raised for elections came from donors contributing a minimum of

$1,000.00. Between 1989 and 1997, in the City, which imposed expenditure limits, only twenty-seven percent (27%) of all funds raised came from donors contributing a minimum of $1,000.00. *See* Tr. at 45; Def. Ex. 20.

16. In Cincinnati's 1995 elections, fifty-three percent (53%) of all funds raised for elections came from donors contributing at least $1,000.00, whereas only six percent (6%) of the funds raised came from donors contributing less than $100.00. In the City's 1995 elections, by contrast, twenty-seven percent (27%) of all funds raised came from donors contributing a minimum of $1,000.00 and thirteen percent (13%) of all funds raised came from donors contributing less than $100.00. *See* Tr. at 46; Def. Ex. 21.

17. In the last federal Congressional election, in more than half the Congressional districts in the country, the winning candidate outspent the losing candidate by a factor of ten to one or more. *See* Tr. at 20-21.

18. As the cost of elections rise, candidates for office at every level of federal, state, and city government are under a great deal of pressure to engage in fundraising activities and to depend on the goodwill of their donors. *See id.* at 22-23.

19. Voter turnout for all of the City's elections between 1974 and 1999 was approximately forty percent (40%). *See* Def. Ex. 1 at 7. Voter turnout for cities without expenditure limits is generally between twenty-five percent (25%) to thirty-five percent (35%). *Id.* Voter turnout in the City is generally higher than most major cities. *See id.* at 7-8.

20. Campaigns where there are no spending limits in place tend to reduce the number of lower-income to lower-middle-income citizens who can run for office with some expectation of winning. *See id.* at 10.

7

21. A spending gap between incumbents and challengers generally results in diminished competitiveness in elections. *See id.* at 11.

22. Candidates in elections where spending limits are imposed tend to spend more campaign money on actual voter contact. *See id.* at 14.

23. A survey of the City's voters shows that most voters consider newspaper coverage, public debates and forums, seeing the candidate in person, and radio and television news coverage more important than radio and television advertisements. *See* Def. Ex. 2 at 2.

24. Fifty-seven percent (57%) of surveyed City voters think that federal elections are overly influenced by special interest money. In contrast, only twenty-three percent (23%) think that the City elections are overly influenced by special interest money. *See* Def. Ex. 2 at 3. Forty-nine percent (49%) think that only candidates with access to large sums of money are able to run for federal office and win. *See id.* Only five percent (5%) think that ordinary citizens are able to run for federal office and win. *See id.*

25. Fifty-seven percent (57%) of surveyed City voters strongly favor the current spending limits. *See id.* at 6. Another twenty-five percent (25%) not-so-strongly favor the current spending limits. *See id.* Seventy-one percent (71%) believe that spending limits improve the fairness of elections by ensuring that ordinary citizens, not just the very wealthy, can run for office in the City without having to raise so much money from special interest groups. *See id.*

26. Unlimited spending on mayoral races has a detrimental impact on the local electoral process. *See* Def. Ex. 9 at ¶¶ 4-6.

27. In the last twenty-five years, the cost of running for a seat in the United States House of Representatives[1] has risen by approximately 400 percent. *See* Tr. at 17. This rise does not reflect simply a rise in the cost of living. *See id.* at 18.

28. Federal contribution limits have not effectively changed the negative public perception of the undue influence of large donors on federal elected officials. *See id.* at 22, 34.

29. It is not difficult for large donors to get around federal and state contribution limits through practices such as "bundling." *See id.* at 26-27.

30. Article XIII, Section 4(d)(2) of the City Charter restricts total contributions and expenditures by mayoral candidates as follows:

> (d) No candidate shall allow contributions or make expenditures in excess of the following for any election:
>
> \* \* \*
>
> (2) To a candidate for the office of Mayor contributions or expenditures equal to twice the amount of the annual salary paid by the City of Albuquerque to the Mayor as of the date of filing of the Declaration of Candidacy.

Stip. at ¶8.

31. The City Charter and the Rules and Regulations of the Board of Ethics and Campaign Practices give the Board the power to fine a candidate up to $500 for each violation of Article XIII, Section 4(d)(2), to issue a public reprimand to the candidate and to recommend to the City Council that a candidate duly elected by the voters be removed from office. Stip. at ¶10.

32. The City was scheduled to have a municipal election, including an election for the office of Mayor, on October 2, 2001. Stip. at ¶4.

---

[1] There are no limits on campaign spending by candidates for federal offices.

33. Mr. Homans was a candidate for the office of Mayor of the City, having filed with the City both a Declaration of Candidacy on August 7, 2001, and petitions with in excess of 5,100 valid signatures of registered City voters during the period between July 12 and July 21, 2001. Stip. at ¶5.

34. Mr. Homans was a duly qualified candidate for the office of Mayor of the City with sufficient signatures to be listed as a candidate on the printed ballot for the mayoral election held on October 2, 2001. Stip. at ¶6.

35. The salary of the City Mayor at the time of the filing of the declaration of candidacy was $87,360 per year, resulting in a campaign contribution and expenditure limit for a City mayoral campaign of $174,720 under Article XIII, Section 4(d)(2). Stip. at ¶9.

36. In furtherance of his candidacy for Mayor, Mr. Homans conducted various fundraising and campaign activities during the several months prior to the October 2, 2001 election. Stip. at ¶7.

37. As a result of his campaign activities, Mr. Homans received campaign contributions and pledges in excess of the spending limitations specified under Article XIII, Section 4(d)(2) of the City Charter. App. at 3; Ex. A at ¶8.

38. Defendants contend that Article XIII, Section 4(d)(2) of the City Charter is constitutional and announced that they would enforce the contribution and expenditure limitations against candidates for the office of Mayor, including Mr. Homans, in the October 2, 2001 municipal election. Defendants further maintain that they will enforce the contribution and expenditure limitations in future municipal elections. Stip. at ¶11.

39. The City held a municipal election on October 2, 2001 for certain city offices, including the office of Mayor. Stip. at ¶18.

40. A total of eight candidates sought the office of Mayor in the October 2, 2001 mayoral election. Stip. at ¶19.

41. The official and certified results of the October 2, 2001 mayoral election are as follows:

|   |   |   |
|---|---|---|
| a. | Jim R. Baca | 10,999 votes |
| b. | Martin J. Chavez | 30,292 votes |
| c. | James B. Lewis | 6,747 votes |
| d. | Alan B. Armijo | 2,570 votes |
| e. | Richard W. Homans | 9,737 votes |
| f. | Bob Schwartz | 27,490 votes |
| g. | Mike McEntee | 11,176 votes |
| h. | Kermit D. Vincent | 108 votes |

Stip. at ¶20.

42. Martin J. Chavez was elected Mayor in the October 2, 2001 mayoral election for the City with 30.56% of the vote. Stip. at ¶21.

43. Out of 235,152 registered voters, a total of 99,119 voters voted in the October 2, 2001 City mayoral election. Stip. at ¶24.

44. Article XIII, Section 4(c) requires candidates in municipal elections to publicly disclose campaign contributions and expenditures by filing four statements, signed under oath, with the following information:

    a. The total of all contributions;

    b. The name and residential street address of each contributor, the contributor's principal business occupation, the name and address of the contributor's employer, and the nature of the contributor's or contributor's employer's business, together with the total cumulative cash value contributed by the contributor, when that amount equals or exceeds $25 for the office of Councilor or to a Measure Finance Committee, and $100 for the office of Mayor.

c. All expenditures made on behalf of the campaign, including any reimbursements and the nature thereof, and the name and address of the person or business to whom payment was made.

Stip. at ¶28.

45. According to the Disclosure Statements filed by the candidates for Mayor in the October 2, 2001 election, the candidates received and expended the following amounts:

    a. Jim R. Baca
        Contributions: $333,937.00
        Expenditures: $341,035.08

    b. Martin J. Chavez
        Contributions: $421,753.25
        Expenditures: $421,753.25

    c. James B. Lewis
        Contributions: $61,541.17
        Expenditures: $61,541.18

    d. Alan B. Armijo
        Contributions: $51,514.09
        Expenditures: $51,603.39

    e. Richard W. Homans
        Contributions: $579,043.17
        Expenditures: $595,349.46

    f. Bob Schwartz
        Contributions: $156,003.97
        Expenditures: $154,683.59

    g. Mike McEntee
        Contributions: $173,699.65
        Expenditures: $159,580.85

    h. Kermit D. Vincent
        Contributions: $1,448.00
        Expenditures: $1,088.00

Stip. at ¶29.

## III. CONCLUSIONS OF LAW

The Court has jurisdiction to entertain this matter pursuant to 42 U.S.C. §1983. Venue is proper in the United States District Court for the District of New Mexico. Although the mayoral election in question has taken place, the constitutional issues in this case are capable of repetition yet may evade review unless the Court makes a determination on the constitutionality of Article XIII, Section 4(d)(2) of the City Charter.

Plaintiff challenges the City Charter's limit on campaign expenditures as unconstitutional under the First Amendment. *Buckley v. Valeo* is the "seminal case governing the constitutional review of campaign finance reform efforts, including expenditure limitations." *Landell v. Vermont Pub. Interest Research Group*, 2002 WL 1803685, at *10 (2d Cir. Aug. 7, 2002) (citing 424 U.S. 1). In *Buckley*, the Supreme Court held that expenditure limitations "impose direct and substantial restraints on the quantity of political speech" and "limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'" 424 U.S. 1, 39 (1976) (citations omitted). Accordingly, the Court held that the constitutionality of an expenditure limitation "turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. The limitation thus "must be narrowly tailored to serve a sufficiently strong government interest. Expenditure limitations, being more severe [than contribution limitations], require 'closer scrutiny,' and, relatively speaking, the government interest must meet a more demanding test." *Landell*, 2002 WL 1803685, at *10 (citing *Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 472 (2001)). Applying this standard, the Supreme Court in *Buckley* held that while the governmental interests in preventing corruption and the appearance of corruption were compelling enough to justify

restrictions on campaign contributions, such interests were inadequate to justify restrictions on individual expenditures. *See Buckley*, 424 U.S. at 45-48.

In the Preliminary Injunction Memorandum Opinion denying Mr. Homans a preliminary injunction, this Court stated that "[s]ince the announcement of *Buckley* twenty-five years ago, the Supreme Court has been divided as to *Buckley's* scope. Particularly, there is substantial disagreement amongst the Justices as to whether the ruling in *Buckley* provides a *per se* ban on all expenditure caps." *Homans v. City of Albuquerque*, 160 F. Supp.2d 1266, 1270-71 (D.N.M. 2001). As a result of the "abundance of judicial commentary on compelling governmental interests which fall outside the ambit of *Buckley*," this Court was convinced to read *Buckley's* holding narrowly, and was "persuaded that the holding of *Buckley v. Valeo* does not render Albuquerque's expenditure limits *per se* unconstitutional." *Id.* at 1272. The Court went on to find that the City had demonstrated evidence of two compelling governmental interests, namely preserving the public faith in democracy and reducing the appearance of corruption, and that the City Charter's expenditure limits were narrowly tailored to meet these compelling governmental interests. *Id.* at 1272-73.

Citing the same case law regarding the scope of *Buckley's* holding in light of the post-*Buckley* experience as this Court did in the Preliminary Injunction Memorandum Opinion, the Second Circuit Court of Appeals in *Landell* similarly rejected the contention that *Buckley* established an absolute ban on expenditure limitations. The Second Circuit stated,

> Critically, the Court [in *Buckley*] never concluded that the Constitution would always prohibit expenditure limits, regardless of the reasons and the record supporting the limitations. It simply held that based on the record before it, "[n]o governmental interest that has been suggested is sufficient to justify" the federal expenditure limits. After *Buckley*, there remains the possibility that a legislature could identify a sufficiently strong interest, and develop a supporting record, such that some expenditure limits could survive constitutional review.

*Landell*, 2002 WL 1803685, at *11 (citations omitted). Further, the Second Circuit noted that "an unyielding interpretation of *Buckley* that expenditure limits are *per se* unconstitutional . . . would require us to ignore not only *Buckley's* own language, but also over three decades of experience as to how the campaign funds race has affected public confidence and representative democracy." *Id.* at *13.

As this Court did in the Preliminary Injunction Memorandum Opinion, the Second Circuit next addressed the question of whether the expenditure limitations at issue were narrowly tailored to a sufficiently important governmental interest. The Second Circuit found as follows:

> Fundamentally, Vermont has shown that, without expenditure limits, its elected officials have been forced to provide privileged access to contributors *in exchange for* campaign money. Vermont's interest in ending this state of affairs is compelling: the basic democratic requirements of accessibility, and thus accountability, are imperiled when the time of public officials is dominated by those who pay for such access with campaign contributions.

*Id.*[2] The Second Circuit then upheld the district court's determination that the limits set by Vermont permitted fully effective campaigns and were narrowly tailored. *See Id.* at *23. After thus reviewing Vermont's expenditure limitations "with the level of exacting scrutiny required by *Buckley* and its progeny for expenditure limits," the Second Circuit held these provisions to be constitutional. *Id.*

Unlike the Second Circuit, however, the Tenth Circuit has expressed its disagreement with this Court's interpretation of *Buckley*. In its decision granting Mr. Homans a preliminary injunction,

---

[2] In the context of its discussion regarding Vermont's compelling interest in expenditure limitations, the Second Circuit addressed the problem of bundling – a "distortion of the democratic process" which is caused when contributors "are members of organized, wealthy interest groups that 'bundle gifts.'" *Landell*, 2002 WL 1803685, at *19. The Second Circuit cited to the finding regarding the bundling phenomenon in this Court's Preliminary Injunction Memorandum Opinion, and concluded that this phenomenon was "not anticipated by the Supreme Court in *Buckley*." *Id.*

15

the Tenth Circuit cited *Buckley* as providing a "clear statement" that campaign expenditure limitations "do not survive *even under* the rationale of (1) deterring corruption and preventing evasion of contribution limits, (2) equalizing the financial resources of the candidates, and (3) restraining the cost of election campaigns for its own sake." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243-44 (10th Cir. 2001) (emphasis added). Upon its own "independent examination of the record," the Tenth Circuit held that, even if the "facts do matter, . . . the compelling governmental interests identified by the district court, under the broad headings of preserving faith in democracy and deterring the appearance of corruption, are really no different than the interests deemed insufficient to justify expenditure limitations in *Buckley*." *Id.* at 1244. The Tenth Circuit explicitly rejected this Court's reading of post-*Buckley* case law as evidencing a division within the Supreme Court over *Buckley's* scope. The Tenth Circuit stated that the cases this Court relied upon "all involve limitations on contributions, and even then, the statements are not those of a majority even if joined by other members of the Court," and that "the Supreme Court has not suggested that the distinction between campaign expenditures and campaign contributions is about to change." *Id.* Finally, the Tenth Circuit noted that its decision to grant Mr. Homans a preliminary injunction was "following binding Supreme Court precedent and protecting the core First Amendment right of political expression." *Id.*

This Court is mindful that the decision of an apellate court on an emergency motion for an injunction pending appeal does not constitute a binding decision that plaintiff is entitled to permanent injunctive relief. *See American Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1476-77 (3d Cir. 1996) (en banc). Nonetheless, as a district court within the Tenth Circuit, this Court is bound to follow the Tenth Circuit's interpretation of the law, and its application

16

of the law to the facts. As discussed above, the Tenth Circuit made its own independent examination of the record, which is now again before this Court, and found that the interests the City's expenditure limitations were enacted to protect are insufficient to survive a First Amendment challenge. Thus, under the Tenth Circuit's interpretation of *Buckley* and its application of *Buckley* to the instant facts, this Court is constrained to find that the expenditure limitations in the City Charter constitute an unconstitutional infringement of the First Amendment. Until the Supreme Court revisits the issue of campaign finance reform, thereby resolving the clear conflict that now exists between the Tenth Circuit and the Second Circuit, this Court can reach no other holding. This Court is persuaded that, under the interpretation of *Buckley* applied in the Preliminary Injunction Memorandum Opinion and in the Second Circuit's *Landell* decision, the expenditure limitations in the City Charter would survive a constitutional challenge, as the City has demonstrated that these expenditure limitations are narrowly tailored to serve the compelling interests of deterring corruption and the appearance of corruption, promoting public confidence in government, permitting candidates and officeholders to spend less time fundraising and more time performing their duties as representatives and interacting with voters, increasing voter interest in and connection to the electoral system, and promoting an open and robust public debate by encouraging electoral competition.

### III. RELIEF

**IT IS THEREFORE ORDERED** that the parties' Joint Motion for Stipulated Admission of Evidence, Briefing Schedule and Expedited Determination on the Merits **[Doc. No. 35]** is **GRANTED**.

**IT IS THEREFORE FURTHER ORDERED** that Mr. Homans is entitled to (1) a declaratory judgment that Article XIII, Section 4(d)(2) of the City Charter violates the First

Amendment to the United States Constitution; and (2) a permanent injunction enjoining the City and the City Clerk from enforcement of the expenditure limitations under Article XIII, Section 4(d)(2) of the City Charter.

Dated this 22nd day of August, 2002.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff
Thomas C. Bird
Rick Alvidrez

Attorneys for Defendant
Dan Ramczyk
Randy Autio
Brenda Wright
John C. Bonifaz